Daniel J. GATELY, et al., Plaintiffs, Appellees,

v.

COMMONWEALTH OF MASSACHUSETTS, et al., Defendants, Appellants.

No. 92–2485.

United States Court of Appeals, First Circuit.

Heard March 2, 1993.

Decided Aug. 18, 1993.

---

Deborah S. Steenland, Asst. Atty. Gen., with whom Scott Harshbarger, Atty. Gen. and Thomas A. Barnico, Asst. Atty. Gen., Boston, MA, were on brief for appellants.

James B. Conroy, with whom Katherine L. Parks and Donnelly, Conroy & Gelhaar, Boston, MA, were on brief for appellees.

Paul D. Ramshaw, Donald R. Livingston, Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel and Vincent J. Blackwood, Asst. Gen. Counsel, Washington, DC, on brief for the U.S.E.E.O.C., amicus curiae.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

This is an appeal from a preliminary injunction issued pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, prohibiting defendants-appellants Commonwealth of Massachusetts, Thomas Rapone, Secretary of Public Safety, and Francis McCauley, Executive Director of the Massachusetts Retirement Board, from enforcing the statutorily mandated retirement of members of the Department of State Police aged 55 or older. For the reasons set forth below, we affirm.

## I.

### Factual Background

In December 1991, the Massachusetts legislature enacted 1991 Mass.Acts ch. 412 (effective July 1, 1992), which called for, *inter alia*, the consolidation of the Commonwealth's largest police force, the Division of State Police, with its three smaller forces, the Metropolitan District Commission Police ("MDC"), the Registry of Motor Vehicles Law Enforcement Division ("Registry"), and the Capitol Police. The newly consolidated police force is referred to as the "Department of State Police." [1]

Prior to the consolidation, officers of the MDC, Registry, and Capitol Police were subject to a mandatory retirement age of 65, and officers of the Division of State Police were subject to a mandatory retirement age of 50. Section 122 of Chapter 412 repealed those mandatory retirement ages and declared that all members of the Consolidated Department who reach their fifty-fifth birthday on or before December 31, 1992, shall retire by that date.

On December 21, 1992, ten days before the effective date of the new mandatory retirement age, plaintiffs, members of the former MDC and Registry divisions,[2] commenced this action seeking injunctive relief on the grounds that the new mandatory retirement age violated the ADEA. *See* 29 U.S.C. § 623(a)(1). On December 30, 1992, after a hearing that same date, the district court issued an order granting plaintiffs' motion for preliminary injunctive relief. *See Gately v. Massachusetts*, 811 F.Supp. 26 (D.Mass. 1992). This appeal followed.

## II.

### The Preliminary Injunction Standard

In deciding whether to grant a preliminary injunction, a district court must weigh the following four factors: (1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, *i.e.,* "the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld," *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991); and (4) the effect on the public interest of a grant or denial of the injunction. *See, e.g., id.* How-

---

1. For purposes of clarity, however, throughout this opinion we refer to the new Department of State Police as the "Consolidated Department."

2. The complaint lists 45 officers, 30 of whom reached the age of 55 or older on December 31, 1992.

ever, the *"sine qua non* of [the preliminary injunction standard] is whether the plaintiffs are likely to succeed on the merits." *Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir.1993). *See also United Steelworkers of America v. Textron, Inc.,* 836 F.2d 6, 7 (1st Cir.1987) ("The heart of the matter is whether 'the harm caused plaintiff without the injunction, *in light of* the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants.'") (quoting *Vargas–Figueroa v. Saldana,* 826 F.2d 160, 162 (1st Cir.1987) (emphasis in original)).

■ A party appealing a grant of a preliminary injunction bears the heavy burden of showing that the district court either committed a mistake of law or abused its discretion. *Guilbert,* 934 F.2d at 5. *See also K-Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 915 (1st Cir.1989) ("Decisions as to granting or withholding injunctive redress can best be made by trial courts steeped in the nuances of a case and mindful of the texture and scent of the evidence."). Without such a showing, we will not disturb the ruling below. *Id.*

Here, the district court weighed the four criteria recited above and held that the scales tipped in favor of an injunction. *See Gately,* 811 F.Supp. at 27–31. Although the court admitted that the evidence relative to the second, third, and fourth criteria was not markedly in either party's favor, it found that plaintiffs would likely succeed on the merits. *Id.* at 31. Accordingly, it issued the requested preliminary injunction.

On appeal, defendants generally challenge the court's application of all four criteria. Having reviewed the district court's opinion, however, it is clear to us that appellate elaboration is warranted only as to the first and second criteria. We therefore adopt the district court's cogent and well-reasoned opinion insofar as it relates to the other two prongs of the preliminary injunction test and focus on whether the court correctly presaged (a) plaintiffs' likelihood of success at trial, and (b) the potential for irreparable harm to plaintiffs in the absence of an injunction.

## III.

### Discussion

*A. Plaintiffs' Likelihood of Success*

■ Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual ... because of such individual's age...." 29 U.S.C. § 623(a)(1). The ADEA contains an "escape clause," however, which allows employers some limited flexibility to take age into consideration in business decisions. Commonly referred to as the "BFOQ exception," the clause allows employers "to take any action otherwise prohibited under [the statute] ... where age is a bona fide occupational qualification reasonably necessary to the normal operation of a particular business...." 29 U.S.C. § 623(f)(1). As noted by the Supreme Court, this clause is " 'an extremely narrow exception to the general prohibition' of age discrimination contained in the ADEA." *Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 412, 105 S.Ct. 2743, 2751, 86 L.Ed.2d 321 (1985) (quoting *Dothard v. Rawlinson,* 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977)).

In *Criswell,* the Court enunciated a two-pronged test for courts to use in discerning the width of the "extremely narrow" BFOQ exception. *Id.* at 412–20, 105 S.Ct. at 2750–55 (adopting the two-part test outlined in *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224, 235–36 (5th Cir.1976)). Under the first prong, the employer must be able to show that the qualification at issue is *"reasonably necessary* to the essence of [its] business...." *Criswell,* 472 U.S. at 413, 105 S.Ct. at 2751 (quoting *Usery,* 531 F.2d at 236) (emphasis in original); *EEOC v. City of East Providence,* 798 F.2d 524, 528 (1st Cir. 1986) (quoting *Criswell* ). The second prong requires that the employer justify its use of age as a proxy for that qualification. *Criswell,* 472 U.S. at 414, 105 S.Ct. at 2751; *City of East Providence,* 798 F.2d at 528. Justification can be accomplished in one of two ways. The employer can show that it " 'had reasonable cause to believe, that is, a *factual basis* for believing, that all or substantially all persons over the age qualification[ ] would be unable to perform ... the duties of the

job involved.'" *Criswell*, 472 U.S. at 414, 105 S.Ct. at 2751–52 (quoting *Usery*, 531 F.2d at 235) (emphasis added). Alternatively, the employer can establish that "it is 'impossible or highly impractical' to deal with the older employees on an individualized basis." *Criswell*, 472 U.S. at 414, 105 S.Ct. at 2752 (quoting *Usery*, 531 F.2d at 235).

As support for their contention that the district court erred in determining plaintiffs' likelihood of success under the ADEA, defendants make the following two arguments: (1) controlling precedent in this circuit forecloses plaintiffs' claims, *see EEOC v. Trabucco*, 791 F.2d 1 (1st Cir.1986) (*"Trabucco II"*); *Mahoney v. Trabucco*, 738 F.2d 35 (1st Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984) (*"Trabucco I"*); and (2) plaintiffs' claims are barred by a 1986 amendment to the ADEA. *See* 29 U.S.C. § 623(j). We address each argument in turn.

### 1. Trabucco I and II

Defendants first contend that plaintiffs' challenge to chapter 412 is precluded by the doctrine of *stare decisis*. In so doing, they rely upon a case in which we upheld a lower court's finding that the Massachusetts State Police's statutorily mandated retirement age of 50 was a BFOQ, *see Trabucco I*, 738 F.2d at 37–42, and a case in which we subsequently reaffirmed *Trabucco I* on *stare decisis* principles. *See Trabucco II*, 791 F.2d at 2–5. Defendants' reliance upon these cases is misplaced.

■ The doctrine of *stare decisis* renders the ruling of *law* in a case binding in future cases before the same court or other courts owing obedience to the decision. "[U]nlike the doctrines of *res judicata* and collateral estoppel, [the doctrine of *stare decisis* ] is not narrowly confined to parties and privies, and it does not draw its force from the policy protecting final judgments." *Trabucco II*, 791 F.2d at 2. "Rather, when its application is deemed appropriate, the doctrine is broad in impact, reaching strangers to the earlier litigation." *Id.*

■ The essential principles of *stare decisis* may be described as follows:

(1) an issue of law must have been heard and decided; (2) if an issue is not argued, or though argued is ignored by the court, or is reserved, the decision does not constitute a precedent to be followed; (3) a decision is *stare decisis* despite the contention that the court was not properly instructed by counsel on the legislative history, or that the argument was otherwise insufficient; (4) a decision may properly be overruled if seriously out of keeping with contemporary views or passed by in the development of the law or proved to be unworkable; and (5) there is a heavy presumption that settled issues of law will not be reexamined.

*Trabucco II*, 791 F.2d at 4 (internal quotations and citations omitted). Fidelity to this principle promotes "stability, predictability, and respect for judicial authority." *Hilton v. South Carolina Pub. Rys. Comm'n*, —— U.S. ——, ——, 112 S.Ct. 560, 564, 116 L.Ed.2d 560 (1991).

■ As *stare decisis* is concerned with rules of law, however, a decision dependent upon its underlying facts is not necessarily controlling precedent as to a subsequent analysis of the same question on different facts and a different record. *Complaint of Tug Helen B. Moran, Inc.*, 607 F.2d 1029, 1031 (2d Cir.1979). *Cf. Gavin v. Chernoff* 546 F.2d 457, 458–59 (1st Cir.1976) (invoking *stare decisis* to follow earlier opinion where "appellants' essential arguments remain much the same as those considered and [previously] rejected[, and] [t]here are no compelling new reasons and no change in circumstances justifying reconsideration of the previous decision") (internal quotation marks omitted).

■ A brief examination of the two cases relied upon by defendants reveals the inapplicability of the doctrine here. In *Trabucco I*, the district court had held that Mass. Gen.L. ch. 32, § 26(3)(a), which mandated retirement at age 50 for the Division of State Police, while a valid BFOQ for the Division generally, violated the ADEA as applied to the plaintiff, a state trooper who had a desk job. We reversed, holding that the age qualification applied to all members of the state police, regardless of whether they had field

or desk jobs. *Trabucco I*, 738 F.2d at 39 (phrase " 'occupational qualification' means more of a recognized and discrete vocation rather than a desk assignment for an employee subject to all the obligations and benefits of a quasi-military organization"). Our decision left intact, however, the district court's finding that age 50 was a BFOQ for the Division of State Police. *Id.* at 37.

After the district court ruling, but before our reversal, the EEOC brought an action challenging the very same mandatory retirement statute. The district court, relying upon *Trabucco I*, held that the action was foreclosed by principles of *stare decisis.* On appeal, the EEOC contended that, because plaintiff Mahoney had offered no evidence at trial to rebut the Commonwealth's BFOQ evidence, the decision lacked precedential value. *Trabucco II*, 791 F.2d at 4. No facts had changed and the EEOC argued no new law. It simply contended that it would offer the expert testimony that had not been presented by plaintiff Mahoney. Although recognizing the "non-absoluteness of *stare decisis,*" *id.* at 4, we analyzed the proceedings below and found that Mahoney raised and argued, and the district court decided, the precise question of whether the across-the-board BFOQ was valid. *Id.* at 4–5 ("Thus, the issue in the case at bar was addressed by Mahoney in his litigation, even if not as thoroughly as the EEOC would have desired."). As a result, we rejected the EEOC's attempt to reopen that issue. *Trabucco II*, 791 F.2d at 4–5 ("We have found no case, nor has appellant cited us to any, that supports its contention that a weak or ineffective presentation in a prior case deprives the ruling of precedential effect.").[3]

There are two compelling reasons why these cases do not foreclose the instant action. First, the question of whether a mandatory retirement age is a BFOQ is a fact-intensive inquiry. *See Criswell*, 472 U.S. at 417–23, 105 S.Ct. at 2753–56 (discussing the fact-based nature of the BFOQ defense);

*Johnson v. Mayor & City Council of Baltimore*, 472 U.S. 353, 362, 105 S.Ct. 2717, 2722, 86 L.Ed.2d 286 (1985) (stressing the "particularized, factual showing" required by the ADEA of an employer claiming an age qualification is a BFOQ); *EEOC v. Boeing Co.*, 843 F.2d 1213, 1216 (9th Cir.) ("The validity of a BFOQ turns upon factual findings, preferably ones by a jury."), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988); *Muniz Ramirez v. Puerto Rico Fire Servs.*, 757 F.2d 1357, 1358 (1st Cir.1985) ("We must reject appellant's attempt ... to have us rule as a matter of law that an entry age of thirty-five for firefighters is a BFOQ. A particular age limit for entry into a particular position is a matter of proof."). *See also Monroe v. United Air Lines, Inc.*, 736 F.2d 394, 405 (7th Cir.1984) ("a once-valid BFOQ may lose its justification with advances in medical science. That the age 60 rule may have been a BFOQ in 1978 does not place it beyond challenge [in 1983]"), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1356, 84 L.Ed.2d 378 (1985). Here, the facts—as found by the district court—differ from those underlying *Trabucco I and II* in one crucial respect. In the instant case, plaintiffs presented the district court with evidence, not available to the plaintiffs in *Trabucco I and II*, suggesting that age is not an effective proxy for determining an individual's suitability to serve in a public safety job. *See* Frank J. Landy et al., *Alternatives to Chronological Age in Determining Standards of Suitability for Public Safety Jobs* (January 31, 1992). And, as it made clear below, the district court found this evidence persuasive. *See Gately*, 811 F.Supp. at 31 ("Here ... the most thorough and authoritative evidence presented states unequivocally that currently available tests are more effective than age in identifying officers who may be unable to perform the law enforcement and public safety tasks required of them."). We see no abuse of discretion in the district court's evaluation of this evidence.

---

**3.** In so doing, we observed that counsel for the EEOC

was not only aware of the [*Trabucco I*] litigation, but could have intervened in the district court or could have filed an amicus brief on

appeal. That it did neither was attributed to its assessment that the decision would not be given *stare decisis* effect and to certain practical problems, such as obtaining expert witnesses.

*Trabucco II*, 791 F.2d at 4.

Second, not only are the underlying facts in this case different from those present in *Trabucco I and II*, but the legal landscape has been altered in critical respects as well. In *Trabucco I*, which was decided prior to the Supreme Court's most recent pronouncements on the ADEA, *see supra* pp. 1225–26, this court applied a standard more lenient than that subsequently adopted by the Supreme Court to determine—under the first prong of the test—whether age was a BFOQ. In *Trabucco I*, we held that an employer must show that the age qualification is "reasonably related" to the operation of its business. *Trabucco I*, 738 F.2d at 37. A year later, the Supreme Court clarified that "[t]he BFOQ standard adopted in the statute is one of 'reasonable necessity,' not reasonableness." *Criswell*, 472 U.S. at 419, 105 S.Ct. at 2754. *See id.* at 414, 105 S.Ct. at 2751 (explaining further that "age qualifications [must] be something more than 'convenient' or 'reasonable'....). The Court also reiterated that "the BFOQ exception 'was in fact meant to be an extremely narrow exception to the general prohibition' of age discrimination contained in the ADEA." *Id.* at 412, 105 S.Ct. at 2751 (quoting *Dothard*, 433 U.S. at 334, 97 S.Ct. at 2729). Further, in a case issued the same day as *Criswell*, the Court elaborated on the evidentiary standard which must be met in these cases, stressing that an employer must make a "particularized, factual showing" that age is an effective proxy for the qualification at issue. *Johnson*, 472 U.S. at 362, 105 S.Ct. at 2722.

In light of *Criswell* and *Johnson*, we agree with the district court's conclusion that *Trabucco I*, which was decided under the more lenient "reasonable relation" standard, and was based on less than the required "particularized, factual showing," has been called into question. *See Gately*, 811 F.Supp. at 30.

In sum, therefore, this case involves a different set of facts, a newly crafted set of legal rules, and, as such, legal issues of first impression for this court. As a result, *stare decisis* does not provide a basis for avoiding a trial on the merits.

## 2. The 1986 Amendment to the ADEA

Defendants next urge the application of 29 U.S.C. § 623(j), a 1986 amendment to the ADEA which, they contend, forecloses plaintiffs' claims. We disagree.[4]

■ The task of statutory interpretation begins with the language of the statute, and statutory language must be accorded its ordinary meaning. *See, e.g., Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 706 (1st Cir.1992). Section 623(j) provides in relevant part:

**Firefighters and law enforcement officers attaining hiring or retiring age under State or local law on March 3, 1983[.]**

> It shall not be unlawful for an employer which is a State ... to discharge any individual because of such individual's age if such action is taken—
>
> (1) with respect to the employment of an individual ... as a law enforcement officer and the individual has attained the age of ... retirement in effect under applicable State or local law on March 3, 1983, and
>
> (2) pursuant to a bona fide ... retirement plan that is not a subterfuge to evade the purposes of this chapter.[5]

This amendment, which took effect on January 1, 1987, and expires on December 31, 1993, gives states and local officials a seven-year transition period within which they can lawfully retire law enforcement officers pursuant to a retirement plan in effect on March 3, 1983. It was on that date that the Supreme Court decided, in the seminal case of

---

4. Although the district court did not address the applicability of this amendment, it is purely a matter of statutory interpretation, and therefore a question of law which we can review in the first instance. *Cf. In re Erin Food Servs., Inc.*, 980 F.2d 792, 799 (1st Cir.1992).

5. The term "law enforcement officer" is defined as:

> [A]n employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of a State, including an employee engaged in this activity who is transferred to a supervisory or administrative position....

*EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), that the ADEA's prohibition against mandatory retirement was applicable to states and local governments.

■ According to defendants, this statute permits them to apply Chapter 412 to plaintiffs because (a) Mass.Gen.L. ch. 32, § 26(3)(a), *in effect* on March 3, 1983, mandated retirement at age 50 for the members of the former Division of State Police; (b) although Chapter 32, § 26(3)(a) was not applicable to these specific plaintiffs on that date, it was applicable to the members of the former Division of State Police; and (c) the duties formerly assigned the Division of State Police have now been assumed by the members of the Consolidated Department. In effect, therefore, defendants contend that § 623(j) allows them to take a group of officers who, in 1983, were subject to retirement at age 65, give them a new title in 1992, and, in so doing, subtract 10 years from their retirement age.

The plain meaning of the statutory language simply does not support this result. Until its expiration on December 31, 1993, the statute allows states to retire an individual law enforcement officer on the basis of age if "the *individual* has attained the age of . . . retirement *in effect* under *applicable* state or local law on March 3, 1983 . . . ." 29 U.S.C. § 623(j)(1) (emphasis added). On March 3, 1983, the statute applicable *to plaintiffs* required them to retire at age 65. Therefore, as plaintiffs have not "attained the age of . . . retirement in effect under applicable state or local law on March 3, 1983," § 623(j) does not give defendants the refuge they seek.

To be sure, the phraseology is not a model of clarity. Yet, in their effort to read a loophole into § 623(j), defendants ignore the word "individual," which appears four times in the statute. When read as a whole, we believe that the language compels the conclusion that the word "applicable" means "applicable to the individual." [6]

Even if we were to construe the statute as being ambiguous, however, we do not believe that defendants' interpretation is consistent with the statute's purpose. As explained by Senator Wendell Ford of Kentucky, one of the primary architects of the final compromise version of this statute, Congress intended § 623(j) "to provide relief to those jurisdictions which were forced to respond to [*EEOC v. Wyoming* ], while at the same time ensuring that no lesser discrimination protection will be provided *for these workers* than what was in effect at the time [*EEOC v. Wyoming* ] was decided." 132 Cong.Rec. S16850–02 (daily ed. October 16, 1986) (emphasis added).

The statute, therefore, was enacted to give states a grace period of seven years during which time certain retirement plans for law enforcement officers would be exempted from the ADEA's reach. Senator Ford explained that the statute froze pre-existing age caps but did not exempt from scrutiny stricter age caps subsequently enacted:

> [T]his compromise establishes a *floor* for the hiring and retirement requirements which a State or local government can set. The hiring and retirement age requirements of a plan in effect as of March 3, 1983 become the *floor* for allowable plans. . . . If jurisdictions have raised or eliminated mandatory retirement ages after this date, they have the choice of either moving back to the plan requirements in effect on March 3, 1983, or remaining where they are. However, States and local governments would not be able to *lower* retirement age requirements below what was [sic] in effect as of March 3, 1983.

*Id.* (emphasis added).

Thus, in our view, neither the language of the statute nor its legislative history supports the position advanced by defendants. This statute was enacted to provide an exception, limited in both purpose and duration, to the ADEA's prohibition on mandatory retirement. The Commonwealth's reliance upon this limited exception to insulate from review its adoption of a new retirement policy which

---

6. We want to make clear, however, that we do not read § 623(j)(1) as allowing those officers who may have elected to transfer out of the

MDC, Registry, or Capitol Police and into the Division of State Police to claim the retirement age applicable to them on March 3, 1983.

subtracts ten years from the retirement age statutorily applicable to plaintiffs on March 3, 1983, is therefore misplaced.

■ In a last ditch attempt, however, to persuade us of § 623(j)'s applicability, defendants alternatively argue that the statute is ambiguous, and, as such, any ambiguity must be resolved in the Commonwealth's favor. In support of their position, defendants cite *Gregory v. Ashcroft,* —— U.S. ——, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), in which the Supreme Court held that the ADEA did not preempt a state constitutional provision mandating the retirement of state judges at age 70. *Id.,* —— U.S. at ——, 111 S.Ct. at 2408 (construing the "policymaking" exception in § 630(f)). In that case, the Court reasoned that state judges are among those " 'officers who participate directly in the formulation, execution, or review of broad public policy [and thus] perform functions that go to the heart of representative government.' " *Id.,* —— U.S. at ——, 111 S.Ct. at 2402 (quoting *Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853 (1973)). The power of the people of a state to "determine the qualifications of their most important government officials" is, the Court held, fundamental to our federalist system. *Id.* Thus, courts should not, according to *Gregory,* construe federal statutes to infringe on that power unless Congress expresses its intent to do so in the plainest terms. *Id.,* —— U.S. at —— - ——, 111 S.Ct. at 2401–03. Finding the text of § 630(f) ambiguous on the question of whether Congress intended to exempt state judges, the Court applied the "plain statement" rule, reasoning that "[i]n the face of such ambiguity, we will not attribute to Congress an intent to intrude on state governmental functions . . . ." *Id.,* —— U.S. at ——, 111 S.Ct. at 2406.

We have recently discussed the limited scope of the Court's holding in *Gregory. See EEOC v. Massachusetts,* 987 F.2d 64, 67–70 (1st Cir.1993). In that case, we reversed the district court's decision, based on its reading of *Gregory,* that the ADEA did not preempt a state statute requiring annual medical examinations for its employees at age seventy. We reasoned that, although the *Gregory* court was "unwavering in its desire to pro-

tect state sovereignty and principles of federalism," it made "unequivocally clear . . . the narrowness of its holding." *EEOC v. Massachusetts,* 987 F.2d at 68, 69 ("At no point did the Court suggest that all state regulations of public employees are questions at the heart of state sovereignty.").

We likewise reject defendants' argument that *Gregory*'s "plain statement" rule bars plaintiffs' cause of action. As discussed above, we find no ambiguities in the text of § 623(j) which give us pause as to its applicability here. *See Gregory,* —— U.S. at ——, 111 S.Ct. at 2406 (explaining that "plain statement" rule is "a rule of statutory construction to be applied where statutory intent is ambiguous"). *See also Hilton,* —— U.S. at ——, 112 S.Ct. at 566 (reiterating the same). Moreover, unlike the statutory exemption at issue in *Gregory,* § 623(j) makes plain Congress' intent that the ADEA protect law enforcement officers from forced retirement in cases where the retirement plan at issue is more restrictive than that in effect on March 3, 1983, or is a "subterfuge to evade the purposes" of the ADEA.

■ In any event, we think defendants give *Gregory* far too broad a reading. Plaintiffs, unlike the state judges at issue in *Gregory,* are not "constitutional officers" who "participate directly in the formulation, execution, or review of broad public policy. . . ." *Gregory,* —— U.S. at —— - ——, 111 S.Ct. at 2401–02. Thus, the Court's concern with federal infringement of a core function going to the "heart of representative government" is not present here. For these reasons, therefore, we decline to apply *Gregory* in the manner urged by defendants.

Accordingly, we find no abuse of discretion or mistake of law in the district court's conclusion that there was a likelihood that plaintiff would succeed on the merits. We turn now to the question of irreparable harm.

*B. The Potential for Irreparable Harm*

Defendants also contend that plaintiffs failed to make the requisite showing of irreparable harm, and that the district court, therefore, abused its discretion in granting plaintiffs' motion for injunctive relief. In so

doing, defendants rely principally upon *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), which they assert forecloses plaintiffs' claims. Because this court has not yet had occasion to engage in a detailed analysis of *Sampson*, and this case calls for a careful reading of the opinion, we begin with a discussion of that case.

In *Sampson*, the Supreme Court held that a probationary federal employee, who sought to enjoin her dismissal from employment pending an administrative appeal to the Civil Service Commission ("CSC"), had to make a particularly strong showing of irreparable harm to obtain preliminary relief. *Sampson*, 415 U.S. at 91–92, 94 S.Ct. at 953–54. The critical facts are as follows. Upon her dismissal from the defendant government agency, the plaintiff filed an administrative appeal with the CSC, alleging that the agency, in dismissing her, had failed to follow applicable federal regulations. Subsequently, she filed an action in federal district court seeking reinstatement while her administrative appeal was pending. In her complaint, she alleged that the dismissal would deprive her of income and cause her to suffer the embarrassment of being wrongfully discharged. Finding that plaintiff might suffer irreparable harm before the CSC could consider her claim, the district court granted the injunction, and the Court of Appeals affirmed. *Id.* at 66–67, 94 S.Ct. at 941–42. The Supreme Court reversed, concluding that the harm plaintiff alleged she would suffer was not irreparable. *Id.* at 91–92, 94 S.Ct. at 953–54.

The questions presented on appeal were twofold: (1) whether the district court had authority to issue the injunction, and (2) if so, whether the injunction was warranted. The Court stated early in its opinion that the two questions were analytically related and could not be neatly "bifurcated." *Id.* at 68, 94 S.Ct. at 942. Accordingly, discussion of the one makes little sense in the absence of any mention of the other.

Although the Court ultimately answered the first question in the affirmative, it did so only after noting the multiple factors which weighed against a finding that the district court had authority to award the injunction at issue. Those factors included: (1) the fact that plaintiff was seeking relief prior to having exhausted her administrative remedies, and the concomitant "disruptive effect which the grant of the temporary relief ... was likely to have on the administrative process," *id.* at 83, 94 S.Ct. at 949; (2) the lack of any express statutory basis for the injunction; (3) the absence of any case law supporting this particular injunction; (4) "the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs," *id.* at 83, 94 S.Ct. at 949 (internal quotations omitted); and (5) the fact that plaintiff was a probationary employee entitled to few procedural rights under the relevant regulations, *id.* at 81–82, 94 S.Ct. at 948–49. Despite these considerations, however, the Court conceded the district court's limited authority to issue an injunction in this type of case, stating that it was "not prepared to conclude that Congress in this class of cases has *wholly* divested the district courts of their customary authority to grant temporary injunctive relief...." *Id.* at 80, 94 S.Ct. at 948 (emphasis added).

Importantly, the Court then admonished district judges that, although the factors listed above did not render them "wholly bereft of the authority" to grant injunctive relief "in this class of cases," they could not exercise that authority "without regard to those factors." *Id.* Indeed, the Court declared that those factors "are entitled to great weight in the equitable balancing process which attends the grant of injunctive relief." *Id.*

Before turning to the dispositive second question, i.e., whether injunctive relief was warranted, the Court again reiterated the close analytical relationship between the first and second questions:

> Although we do not hold that Congress has wholly foreclosed the granting of preliminary injunctive relief in such cases, we do believe that [plaintiff] at the very least must make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases.

*Id.* at 84, 94 S.Ct. at 950.

In analyzing the second question, the Court first noted the complete absence in the

record, with the exception of certain statements in plaintiff's unverified complaint, of any evidence of irreparable harm. *Id.* at 89–91, 94 S.Ct. at 952–53. The Court of Appeals had held that, at that stage of the proceedings, the district court did not need to find that plaintiff was actually irreparably harmed, and that, in any event, plaintiff's allegations afforded a basis for such a finding. The Court disagreed on both counts.

First, the Court stated unequivocally that irreparable harm is a critical element of any injunctive relief in federal court. *Id.* at 88, 94 S.Ct. at 951. Second, the Court explained that plaintiff's allegations of temporary loss of income and harm to reputation did not amount to a sufficient showing of irreparable harm. Even under traditional standards, according to the Court, temporary loss of income, which can be recouped at the end of a trial, "does not usually constitute irreparable injury." *Id.* at 90, 94 S.Ct. at 953.[7]

As for plaintiff's allegations of harm to reputation, the Court found them unpersuasive. It was difficult to imagine, according to the Court, how the agency's failure to follow proper procedures in effectuating her discharge could cause harm to plaintiff's reputation, especially where any damage could be undone by an administrative determination in her favor.

The Court assumed, however, for the purposes of its opinion, that plaintiff had made a satisfactory showing of financial and reputational hardship, and then held that such a showing "falls far short of the type of injury which is a necessary predicate to the issuance of a temporary injunction in this type of case." *Id.* at 91–92, 94 S.Ct. at 953. In a footnote following this holding, the Court provided the following caveat:

> We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such

extraordinary cases are difficult to define in advance of their occurrence. We have held that an insufficiency of savings or difficulties in immediately obtaining other .employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual. But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation. Use of the court's injunctive power, however, when discharge of probationary employees is an issue, should be reserved for that situation rather than employed in the routine case.

*Id.* at 92 n. 68, 94 S.Ct. at 953 n. 68 (citing *Wettre v. Hague,* 74 F.Supp. 396 (D.Mass. 1947), *vacated and remanded on other grounds,* 168 F.2d 825 (1st Cir.1948)).

As we read *Sampson,* it teaches that a federal court cannot dispense with the irreparable harm requirement in affording injunctive relief; that temporary loss of income does not rise to the level of irreparable harm in the usual employee discharge case, *see, e.g., Levesque v. Maine,* 587 F.2d 78, 81 (1st Cir.1978) (citing *Sampson* and holding that plaintiff's "possible loss of earnings" did not amount to irreparable harm); and that, before enjoining a government agency from dismissing a Civil Service employee who has not exhausted her administrative remedies, a district court must find that the facts underlying the employee's allegations of irreparable harm are "genuinely extraordinary." *E.g., Soldevila v. Secretary of Agriculture,* 512 F.2d 427, 429–30 (1st Cir.1975). *Sampson* also stands for the general principle that irreparable harm is subject to a sliding scale analysis, such that the showing of irreparable harm required of a plaintiff increases in the presence of factors, including the failure to exhaust administrative remedies, which cut against a court's traditional authority to issue equitable relief. *See Chilcott v. Orr,* 747 F.2d 29, 31–32 (1st Cir.1984) ("In view of the

---

**7.** This premise had particular force in a Civil Service case, the Court explained, because of the Back Pay Act, 5 U.S.C. § 5596(b)(1), which provides a wrongfully discharged Civil Service employee with full payment and benefits for the time period she was out of work. The Court noted that the Act's legislative history suggested that "Congress contemplated that it would be the usual, if not the exclusive, remedy for wrongful discharge." *Id.* at 90–91, 94 S.Ct. at 953.

strong judicial policy against interfering with the internal affairs of the armed forces, we will apply the more stringent test of *Sampson* to applications for preliminary injunctions by military personnel."); *Bailey v. Delta Air Lines, Inc.*, 722 F.2d 942, 944 (1st Cir.1983) ("Here, as in *Sampson*, we think that the procedural requirements of Title VII should be considered in the equitable balancing process [and that] an aggrieved person seeking preliminary relief outside the statutory scheme for alleged Title VII violations would have to make a showing of irreparable injury sufficient in kind and degree to justify the disruption of the prescribed administrative process....").

■ In interpreting *Sampson*, however, numerous other courts have assumed that the "genuinely extraordinary" test for irreparable harm applies in all employee discharge cases, whatever the asserted basis for relief. *See, e.g., Stewart v. United States Immigration & Naturalization Serv.*, 762 F.2d 193, 199–200 (2d Cir.1985); *E.E.O.C. v. Anchor Hocking Corp.*, 666 F.2d 1037, 1040–44 (6th Cir.1981). *But see E.E.O.C. v. Cosmair, Inc.*, 821 F.2d 1085, 1090 (5th Cir.1987) (holding that irreparable harm is presumed where discharged employee has exhausted her administrative remedies and proceeds under a civil rights statute).

Such a conclusion is predicated, in our opinion, upon an overly broad, and faulty, interpretation of *Sampson*'s holding.[8] As the Court itself made clear early in its opinion, the questions of whether the district court had authority to issue the injunction and whether the irreparable harm finding was proper were not analytically distinct. *Sampson*, 415 U.S. at 68, 94 S.Ct. at 942. The Court reiterated throughout the opinion that

the district court should not have weighed the irreparable harm allegations without taking into account the multiple factors rendering tenuous its authority to reinstate a discharged Civil Service employee pending the exhaustion of the administrative appeal process. *See supra* p. 1231. Before leaving the question of the district court's authority, the Court explained that the plaintiff "must make a showing of irreparable injury *sufficient* in kind and degree *to override these factors....*" *Id.* at 84, 94 S.Ct. at 950 (emphasis added). As such, the Court's conclusion that an extraordinary showing of irreparable harm was required to override those factors was hardly surprising.

Needless to say, those factors are not present in all employee discharge cases. And, it makes little sense, in our opinion, to require a district court to weigh all discharged employees' requests for injunctive relief as if they applied. Nothing in *Sampson* suggests that result. Rather, the Court repeatedly referred to the fact-bound nature of its holding. For instance, the Court stated that the plaintiff's showing "falls far short of the type of injury which is a necessary predicate to the issuance of a temporary injunction *in this type of case.*" *Id.* at 91–92, 94 S.Ct. at 953–54. And, in the footnote immediately following this holding, the Court stated that "[u]se of a court's injunctive power ..., when discharge of probationary employees is an issue, should be reserved for [the genuinely extraordinary] situation...."[9]

The case before us differs from *Sampson* in several significant respects: (1) plaintiffs are not seeking interim injunctive relief pending the completion of an administrative appeals process; (2) the district court unquestionably had the authority to issue the

---

**8.** In those cases in which we have applied *Sampson*'s heightened standard, we have relied upon the plaintiff's failure to exhaust available administrative remedies. *See Chilcott*, 747 F.2d at 31–33 (plaintiff airman sought injunction without seeking relief before appropriate Air Force administrative boards); *Bailey*, 722 F.2d at 943–45 (plaintiff sought injunction prior to exhausting Title VII remedies); *Soldevila*, 512 F.2d at 429–30 (plaintiff civil servant sought injunction prior to exhausting CSC appeals process). Thus, the precise question of *Sampson*'s applicability where a plaintiff has no administrative remedies

to exhaust is one of first impression in this circuit.

**9.** As support for this holding, the Court cited *Wettre*, 74 F.Supp. at 396, which, like the facts in *Sampson*, involved a discharged civil servant who sought a temporary injunction pending the completion of the administrative appeals process. The *Wettre* court presciently held that, under the circumstances, the complainants' allegations of loss of pay and prestige did not amount to irreparable harm. *Wettre*, 74 F.Supp. at 400–01.

requested equitable relief, *see* 29 U.S.C. §§ 626(b), (c); (3) plaintiffs' allegations of irreparable harm go beyond temporary loss of pay or reputational injury; and (4) plaintiffs' are not claiming that they are "entitled to additional procedural safeguards in effectuating the discharge." *See Sampson*, 415 U.S. at 91, 94 S.Ct. at 953. Instead, they are arguing that their statutorily-based civil rights will be violated in the event of their discharge. Thus, all the factors which rendered the district court's authority to issue the injunction so tenuous in *Sampson*—factors which the court was required to take into consideration in weighing the plaintiff's irreparable harm allegations—are not present here. We do not think, therefore, that these plaintiffs must meet the same exacting standard required of the plaintiff in *Sampson*, although they clearly must establish irreparable harm, and point to factors sufficient to overcome "the traditional unwillingness of courts of equity to enforce contracts for personal services." *Id.* at 83, 94 S.Ct. at 950.

■ The district court held below that plaintiffs had made a sufficient, although not overwhelming, showing of irreparable harm. *See Gately*, 811 F.Supp. at 27–28. The Court rested its holding on two factual findings. First, the Court found that reinstatement would not be an available remedy for those plaintiffs who, at the close of a successful trial on the merits, would have reached the new retirement age, and, as a result of their earlier discharge, would lose their twilight years of employment. *Id.* at 27. Second, the Court was persuaded by plaintiffs' argument that, "time spent away from the force [would] impair the plaintiffs' ability to stay in touch with new developments, especially during this time of transition, thus impairing their effectiveness and that of the State Police as a whole[,] if and when they are ultimately reinstated."[10] *Id.* at 27.

Like the district court, we view the irreparable harm question as a close call. The sole factor cutting against the district court's authority to issue this injunction is the wide latitude traditionally granted the government in dispatching its own internal affairs. *See Sampson*, 415 U.S. at 83, 94 S.Ct. at 949. And, in accordance with *Sampson*'s teachings, the district court took this factor into consideration before granting the injunction. *Gately*, 811 F.Supp. at 28 (balancing the intrusion into internal governmental affairs that would result from the injunction with the harm to plaintiffs in the absence of it, and concluding that any harm to defendants was minimal by comparison). Ultimately, the district court balanced the equities and determined that, in light of plaintiffs' having demonstrated a likelihood of success on the merits, an injunction was warranted.

Mindful of the broad discretion afforded a district court in weighing irreparable harm, *see K–Mart Corp.*, 875 F.2d at 915 (quoting *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C.Cir.1987)), we cannot say that the district court erred in concluding that, under the circumstances, plaintiffs made a sufficient showing of irreparable harm. Accordingly, we affirm the district court's ruling.

## IV.

### Conclusion

In sum, we find the challenges leveled at the district court's issuance of the preliminary injunction unpersuasive. Accordingly, we affirm the district court's decision. *Affirmed. Costs to appellees.*

---

**10.** We recognize that the consolidation process had an anticipated completion date of June 30, 1993. On the basis of this record, however, we have no way of determining whether the process has, in fact, been completed.