**Vincent DE NOVELLIS, Plaintiff,**

v.

**Donna E. SHALALA, Secretary, Department of Health and Human Services, Defendant.**

**Paul H. KELLEY, Plaintiff,**

v.

**Donna E. SHALALA, Secretary, Department of Health and Human Services, Defendant.**

**Laurentina JANEY–BURRELL, Plaintiff,**

v.

**Donna E. SHALALA, Secretary, Department of Health and Human Services, Defendant.**

No. C.A. 96–11655.

United States District Court,
D. Massachusetts.

Nov. 22, 1996.

Jodie Grossman, Boston, MA, for Vincent De Novellis, Paul H. Kelley.

Phyllis Fine Menken, Charlestown, MA, for Laurentina Janey–Burrell.

John A. Capin, Asst. U.S. Atty., George B. Henderson, U.S. Atty's Office, Boston, MA, for Donna E. Shalala.

GERTNER, District Judge.

### MEMORANDUM RE: STAY PENDING APPEAL

## I. BACKGROUND

Three related cases have been consolidated and are now before me.[1] All three involve long-time, management-level employees of the Administration for Children and Families ("ACF"), a division of the federal government's Department of Health and Human Services ("HHS"): Vincent De Novellis, Paul Kelley, and Laurentina Janey–Burrell.

The plaintiffs are all employees in the protected age group: Janey–Burrell is fifty-eight years old, Paul Kelley is sixty, and Vincent De Novellis, sixty-eight. Each is facing imminent, adverse employment action, either in the form of demotions to non-supervisory positions with a loss in pay, or reas-

---

**1.** These cases were originally before Judge Patti B. Saris as cases related to an existing claim decided by Judge Saris. After deciding against the plaintiffs on their petition for preliminary injunctive relief, Judge Saris also concluded that the three cases were not related. They were redrawn and are now before me.

signment to positions a considerable distance from their homes, or "voluntary" retirement. Each has filed administrative claims challenging these actions on the grounds of age discrimination under the Age Discrimination Act ("ADEA"),[2] and failure to abide by the Civil Service Reform Act ("CSRA").[3] Janey–Burrell and De Novellis make an additional claim: that the instant employment action is itself in retaliation for prior EEO complaints. The plaintiffs have filed complaints for preliminary injunctive relief to enjoin these actions, pending administrative review of their various claims.

On September 30, 1996, Judge Patti B. Saris denied preliminary injunctive relief and the plaintiffs have appealed. In the interim, they have sought a stay of Judge Saris' ruling, which necessarily means enjoining the adverse employment action, pending appeal pursuant to Rule 62(c), Fed.R.Civ.Pro.

After additional briefing and argument, I hereby **DENY** the motion for stay pending appeal brought by De Novellis and Kelley. I hereby **GRANT** the motion for stay pending appeal brought by Janey–Burrell, and **EN-JOIN** the government's directed reassignment with respect to Janey–Burrell.

## II. INTRODUCTION

The centerpiece of Janey–Burrell's complaint is retaliation for protected activity. Janey–Burrell maintains that the same supervisor who was principally responsible for the decision at issue here was the very one against whom she filed two EEO complaints. In addition to the disruption occasioned by this transfer/demotion, there is, she claims, an additional and irreparable harm: Transfer or demotion will make it difficult if not impossible for her to continue to litigate her claims, and could well chill the protected activities of others.

As discussed below, cases involving claimed retaliation for engaging in protected opposition activity, like cases raising obstruction of justice, trigger concerns different from those present in the ordinary discrimination case. This genre of claims goes to the integrity of the grievance process, namely, that meritorious discrimination complaints will be discouraged.

I find both a likelihood of success on the merits with respect to that claim and a significant risk of irreparable harm if this Court does not step in to preserve the status quo.

## III. JURISDICTION

As a preliminary matter, the government challenges this Court's subject matter jurisdiction because plaintiffs, it claims, have not exhausted their administrative remedies.

To be sure, the plaintiffs have not exhausted their administrative remedies with respect to their challenge to the adverse decisions at issue here. However, that failure does not preclude jurisdiction for *preliminary* injunctive relief, designed to preserve the status quo pending exhaustion of those remedies. Preliminary equitable relief is unquestionably available under the CSRA, *Sampson v. Murray*, 415 U.S. 61, 93–94, 94 S.Ct. 937, 954–55, 39 L.Ed.2d 166 (1974); under the ADEA, 29 U.S.C. 626(b), *Gately v. Commonwealth of Mass.*, 2 F.3d 1221, 1224–25 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994); and for retaliation claims under Title VII, 42 U.S.C. § 2000e–16. *See Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 887 (2d Cir.1981); *Bailey v. Delta Air Lines, Inc.*, 722 F.2d 942, 944 (1st Cir. 1983).

## IV. STANDARD FOR STAY PENDING APPEAL

The standard for a stay pending appeal, set out by the Supreme Court in *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987), is as follows:

> the factors regulating the issuance of a stay are ...: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other par-

---

**2.** 29 U.S.C. § 621 *et seq.*

**3.** Pub.L. No. 95–454, 92 Stat. 111 *et seq.* (codified, as amended, at various sections of 5. U.S.C.).

ties interested in the proceeding; and (4) where the public interest lies.

*Id.* (citations omitted). *See Rivera–Vega v. ConAgra, Inc.,* 879 F.Supp. 165, 166 (D.P.R.), *aff'd* 70 F.3d 153 (1st Cir.1995). Apart from heightening the required showing on the "success on the merits" prong from "likely" to "strong," this standard is in almost all relevant respects the same as the standard for preliminary injunction. *See Gately,* 2 F.3d at 1224.

In effect, given the obvious similarity of the preliminary injunctive standard and the stay standard, this court is being asked to reconsider Judge Saris' thoughtful analysis. (To be sure, the stay sought here covers a more limited period than did the injunction sought before Judge Saris—namely, a stay pending the parties' appeal of the denial of preliminary injunctive relief to the First Circuit).

### A. *Janey–Burrell*

#### 1. *Likelihood of Success on the Merits*

■ The ACF administers human service programs including Head Start and Aid to Families with Dependent Children. Beginning in 1993, Vice President Gore implemented a National Performance Review of federal government, designed to streamline the government. At the same time, HHS, of which ACF is a part, had begun its own reorganization program, likewise intended to scale down the size of its operation. The National Performance Review was formally completed in 1996; results were announced in the Federal Register on April 24, 1996. In HHS, each Region was to configure its own reorga-

nization. By June of 1996, reorganization of the Boston office of ACF was implemented.

In Boston (Region I), as of September, 1994, there were eight grade 14 ACF employees designated managers. The reorganization ultimately required that five of these mid-level managers, including plaintiffs, all grade 14 employees who are more than forty years old, be reassigned to existing grade 14 supervisory positions currently vacant in larger regions, concededly remote from their homes (including San Francisco, Dallas, and Chicago). The plaintiffs are all long-time residents of the Boston area. In lieu of reassignment to offices outside Region I, plaintiffs were given the difficult choice between "voluntarily" retiring or "voluntarily" accepting demotions to non-supervisory grade 13, step 10 positions, in order to stay in Boston; accepting such a demotion would entail an approximately $13,000 cut in salary.

At least one grade 14 manager was made a "Goal Leader": a status that apparently allowed one to keep a supervisory position in Boston, without demotion or loss in pay.[4]

Janey–Burrell alleges that the decision to reassign her was made for unlawful reasons, namely: 1) in retaliation for her EEO complaints against one of the decisionmakers, Hugh Galligan, ACF Regional Administrator for Region I; and 2) was a violation of the procedural standards set forth by the Federal Personnel Manual.

Judge Saris agreed, but only as to the latter point. HHS Instruction 335–1–30 reads in pertinent part: "Reassignment will not be made to coerce employees into resigning or retiring." The government does not dispute the claim that reassignment for the

4. The government makes the unsupported assertion that *"[e]ach group is headed by a Goal Leader who was an upper-level manager* in Region I prior to the restructuring" in October of 1994. Memorandum In Support Of Defendant's Motion To Dissolve Temporary Restraining Order, at p. 6 (emphasis added). The implication of the government's position is that all goal leaders were individuals at a higher level of management than was Janey–Burrell. The record—at least at this preliminary stage—does not bear this out. According to Diann Dawson, the Director of the Office of Regional Operations for the ACF, in an electronic mail message to Janey–Burrell: "Two intermediate management positions were

maintained following restructuring. Those positions were responsible for Head Start and Child Support Enforcement programs...." In the same message, Dawson states: "Other GM 14 staff were goal leaders.... Managers who were proposed to be reassigned were those who were not goal leaders." Furthermore, in Exhibit C to Dawson's Declaration, the ACF's Revised Streamlining Plan states that "Goal Leaders for each goal will be named from existing managers." One such manager, Robert Briggs, was similarly situated to Janey–Burrell prior to the reorganization. He was made Goal Leader for Goal 3 effective October 1, 1994; he held that position as of February 23, 1996.

purpose of "attriting" employees to meet staff ceilings would be unlawful. *See Order Re: Application For Preliminary Injunction*, at p. 14, CA # 96–11655 (September 30, 1996) (Saris, J.). Judge Saris concluded that the circumstances of this reassignment/demotion met the likelihood of success on the merits standard with respect to the plaintiffs' claims that the primary purpose of the reassignments was attrition, and thus unlawful. *See id.* at 14–15.

The Court ruled against Janey–Burrell, however, on her claim of retaliation, holding that she failed to demonstrate a causal connection between her forced reassignment/demotion and her having brought discrimination claims against her ACF superiors. *See id.* at 9–10; *see also Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir.1996) (to establish *prima facie* retaliation, plaintiff must show causal connection between protected conduct under Title VII (or its equivalent) and the adverse employment action).

The Court found that after Janey–Burrell had filed EEO claims, a protected activity under Title VII, she was then assigned to what appeared to be a good, high-status posi-tion, suggesting that she was not being retaliated against.[5] This position, however, was a temporary one; she was assigned to it—rather than to a "Goal Leader" position which would have protected her job.

The relevant retaliation, however, is the current retaliation: being reassigned to San Francisco after almost twenty-five years of outstanding service as a federal employee at HHS in Boston. I find that this reassignment to San Francisco, under the circumstances, is an adverse employment action.[6]

At almost exactly the time that the reorganization process began, Janey–Burrell was filing formal claims of race and gender-based discrimination and retaliation directed at ACF Region I Regional Administrator Hugh Galligan, and claims of race and gender discrimination against her immediate supervisor, Deputy Regional Administrator Richard Stirling. She alleged in November, 1993 that her performance appraisal was unfair. (That claim was investigated and is now ready for hearing.) In April of 1994, Janey–Burrell was removed from her supervisory position and detailed to an undefined position by Gal-

**5.** Janey–Burrell was given a detail, working for HHS Regional Director Philip Johnston in October, 1994, a position that would, in his description "address critical issues of youth violence and crime in Boston's inner city neighborhoods." Johnston stated that he "needed someone with Ms. Janey–Burrell's expertise and experience at the federal, state and community levels." It is not clear on the record how she came to this position or the extent to which it resulted from her own efforts, rather than the recommendation of Galligan. What is clear, however, is that at no point was she told that the position, a temporary detail, made it easier for Galligan to assign other level 14 managers to the limited number of "Goal Leader" positions: positions Galligan intended to see would remain after reorganization of the agency. Indeed, it may well be that this temporary detail made it easier for Galligan to characterize Janey–Burrell as expendable.

**6.** Judge Saris did not address the government's claim that the transfer to the other side of the country, San Francisco, or the demotion, or "voluntary retirement" did not amount to adverse employment decisions at all. Plainly, such actions, in the context of this case, are adverse. They fundamentally burdened Janey–Burrell's employment and indeed, as the discussion of irreparable harm suggests, her life. They changed the terms and conditions of her job in unpleasant ways. If words—racial epithets, and sexual references—can create a hostile environ-ment and degrade the terms and conditions of employment, surely this 3,000 mile transfer or demotion or forced retirement plan can do so as well. *See Welsh v. Derwinski*, 14 F.3d 85, 86 (1st Cir.1994) ("many things ... could have an adverse impact upon employment" and thus "a case by case review is necessary" to determine the existence *vel non* of an adverse employment action); *see also Wyatt v. City of Boston*, 35 F.3d 13, 15–16 (1st Cir.1994) (noting "other adverse actions" covered by Title VII including "employer actions such as demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees"); *Blackie v. State of Maine*, 75 F.3d 716, 725 (1st Cir. 1996) ("Determining whether an action is materially adverse necessarily requires a case-by-case-inquiry."). At least one Court of Appeals has held that an unfavorable transfer can constitute an adverse employment decision. *See Dominic v. Consolidated Edison Co. of New York, Inc.*, 822 F.2d 1249, 1254–55 (2d Cir.1987); *Nelson v. University of Maine System*, 923 F.Supp. 275, 282 (D.Me.1996) (citing *Dominic* as a case wherein "employee showed adverse employment decision where he was transferred to area with poor working conditions and deluged with work"). *Cf. MacCormack v. Boston Edison Co.*, 423 Mass. 652, 663, 672 N.E.2d 1, 6 (1996).

ligan. She filed a formal EEO complaint against him in July, 1994, alleging that this temporary reassignment was retaliation. (That claim has also been investigated and is ready for hearing.)

There is no doubt that these claims were filed in good faith and she had a "reasonable belief that the practice" she opposed violated Title VII. *Wyatt v. City of Boston,* 35 F.3d 13, 15 (1st Cir.1994).

At the same time, there is no doubt that the individual who was the object of the charges, Galligan, was a major player in the decision concerning how the department was to be reorganized, which jobs were to be eliminated, who was to go where. On June 11, 1996, it was Galligan who personally delivered a letter to Janey–Burrell from Diann Dawson, the Director of Regional Operations for ACF. This letter proposed the reassignment of Janey–Burrell to a supervisory position in San Francisco, equivalent to her position of record. While Dawson was ostensibly in charge of the reassignment decision itself, at the time the letter was drafted in June of 1996, she had only been Director of the Office of Regional Operations for ACF for a little more than a month, since April 29, 1996. The current reorganization process began in 1994 and continued over the next two years, with Galligan at the helm. Indeed, Galligan has conceded that he was the person responsible for making many of the critical reorganization decisions.

Galligan has been the Regional Administrator for Region I since August of 1991. In 1994, at the time of Janey–Burrell's second EEO complaint, Galligan was "directed to streamline ACF's regional office in Boston." He "detailed most mid-level managers who needed reassignment as a result of this 'delayering' process into temporary positions...." The occupant of a temporary position—like Janey–Burrell—would be vulnerable in the subsequent reorganization which was to come. He made decisions as to who would be "Goal Leaders" shortly after Janey–Burrell's second complaint was filed. She was not included. At least one other manager of her level, however, was given a position meant to be permanent (Goal 3 Leader Robert Briggs).

Galligan was "responsible for implementing certain initiatives pursuant to Vice–President Gore's national Performance Review ('NPR') and the resulting Departmental initiatives...." Building on decisions he had already made in the previous years, he chose to reassign mid-level managers not previously made "Goal Leaders." The die was cast for Janey–Burrell.

While the record is truncated and the case is at a preliminary stage, I nevertheless conclude that Janey–Burrell has made a strong showing of the likelihood of success on the merits of her claim of retaliation.

### 2. *Irreparable Harm*

■ The government, applying the test of *Gately,* claims that the harm to Janey–Burrell—a reduction in pay of $13,000, loss of prestige and the emotional distress from losing a management job—fails to meet the irreparable harm standard. *Gately* suggests that the standard for preliminary relief for a Civil Service employee may well be higher than that for a private employee; "before enjoining a government agency from dismissing a Civil Service employee who has not exhausted her administrative remedies, a district court must find that the facts underlying the employee's allegations of irreparable harm are 'genuinely extraordinary.'" *Gately,* 2 F.3d at 1232 (citations omitted). Janey–Burrell's harms, according to the government, do not qualify.

In *Gately,* one factor which persuaded the Court that the harm to the plaintiff was irreparable was that plaintiffs' allegations went beyond "temporary loss of pay or reputational injury." *Gately,* 2 F.3d at 1233–34 (citations omitted).

Retaliation claims, like this one, go beyond the usual injuries and offer examples of extraordinary harm. Title VII protects an individual who has filed a complaint from retaliation therefor. The underlying complaint does not have to be correct or successful; it only has to be in good faith, based on a "reasonable belief that the practice the employee is opposing violates Title VII." *Wyatt,* 35 F.3d at 15 (citations omitted).

Preliminary injunctive relief is necessary to protect the integrity of the complaint process. It is akin to the special penalties that attach to criminal obstruction of justice, and the special concerns undergirding civil contempt; these are designed to protect the integrity of the adjudicative processes. *See generally Yates v. United States,* 355 U.S. 66, 70–71, 78 S.Ct. 128, 131–32, 2 L.Ed.2d 95 (1957) (explaining history of civil and criminal contempt).

Other courts have concluded that "a Title VII suit involving alleged retaliation presents a situation calling for increased sensitivity on the part of a court." *Marxe v. C.W. Jackson,* 833 F.2d 1121, 1125–26 (3d Cir.1987). Where a plaintiff alleges retaliation for filing an EEO complaint and there is a strong likelihood of success on the claim, failure to preserve the status quo can have a "deleterious effect on the exercise of these rights by others," and chill the legitimate oppositional activities of others similarly situated. *Garcia v. Lawn,* 805 F.2d 1400, 1405 (9th Cir. 1986). The Second Circuit observed:

> In addition, the plaintiff asserts that the discharge was in retaliation for her prior claim of a Title VII violation by her employer. A retaliatory discharge carries with it the distinct risk that other employees may be deterred from protecting their rights under the Act or from providing testimony for the plaintiff in her effort to protect her own rights. These risks may be found to constitute irreparable injury.

*Holt v. Continental Group, Inc.,* 708 F.2d 87, 91 (2d Cir.1983).

That harm is exacerbated in this case: If Ms. Janey–Burrell goes to San Francisco, her ability to pursue her current EEO complaints (as well as this current lawsuit) will be significantly impinged. Her counsel is based in the Boston area, as are most (if not all) of the witnesses, and the supervisors against whom she has made her claims.

If she chooses demotion, she will be obliged to work day-to-day with the lower level employees whom she supervised for many years, some of whom are to be witnesses in her EEO case. Many may be chilled from coming forward or testifying. *Marxe,* 833 F.2d at 1126 (in retaliation cases, adverse employment actions "can cause potential witnesses to infer that their employer has retaliated and thereby discourage their cooperation with aggrieved plaintiffs.") That potential for intimidation, in contrast, could well be reduced to some degree, "if potential witnesses observe that the courts afford prompt relief from retaliatory action." *Id.*

Finally, apart from the unique harms occasioned by a retaliation claim, Janey–Burrell's personal situation, as a result of the government's action, is deeply troubling, and goes beyond the ordinary and remediable dislocation of adverse employment decisions. Janey–Burrell has three choices presented to her by the ACF: she can go to San Francisco, uprooting her life and moving across the country, but keeping the same salary and grade 14 supervisory position; she can accept a demotion, entailing a loss in pay, and a loss in rank; or she can retire. If she moves, she loses her effectiveness in the job which she has held for a considerable amount of time. Her effectiveness at her job is based in large part on her abilities to relate to and work with people at every level of her own community, in and around Boston, where she has received numerous accolades for the tremendous job she has been doing throughout the years.

And moving could well undermine the health and well-being of her young asthmatic grandson, for whom she is legal guardian, taking him away from his natural mother, with whom Ms. Janey–Burrell is attempting reconciliation and reunification. *See Stanley v. University of Southern California,* 13 F.3d 1313, 1324 n. 5 (9th Cir.1994) (prospective loss of reputation and serious emotional distress, *inter alia,* not remediable by money damages); *see also Chalk v. United States District Court Central District of California,* 840 F.2d 701, 710 (9th Cir.1988) (immediate emotional and psychological injuries stemming from job transfer cannot adequately be compensated by money damages).

Nor is early retirement a palatable alternative. Like the plaintiffs in *Gately,* being forced to retire now could cause her to "lose the twilight years of employment" while she pursues litigation that could result in rein-

statement. *Gately,* 2 F.3d at 1234. Also, time spent away from ACF during this transformation and restructuring could similarly "impair the plaintiffs' ability to stay in touch with new developments, especially during this time of transition, thus impairing their effectiveness." *Id.*

### 3. *Balancing the Equities: Injury to the Government*

■ The injury to the government is minimal. It is being ordered to do (temporarily) no more than that which it apparently has full discretion to do: to keep Janey–Burrell at her present grade and salary pending appeal. As Judge Saris held: "HHS has the discretion to offer retained pay and grade ... [as] the regulations appear to authorize for a two year grace period...." *Order Re: Application For Preliminary Injunction,* at p. 9 (September 30, 1996). Requiring that the government do what it has the discretion to do does not constitute the kind of harm that could prevent injunctive relief in the context of this case.

### 4. *Public Interest*

■ The public has a strong interest in *bona fide* Title VII claims being brought. A preliminary injunction to preserve the status quo pending the resolution of Janey–Burrell's appeal preserves the complaint process.

In this case, given the strong likelihood that Janey–Burrell will prevail on the merits of her retaliation claims, the significant risk of irreparable harm posed by the options which ACF has presented her, and the minimal harm to the government in being forced to pursue a course of action well within its discretion, the public interest weighs strongly in favor of my granting a stay of Judge Saris's Order denying Ms. Janey–Burrell a preliminary injunction.

### B. *De Novellis's and Kelley's Motions for Stay*

Neither Mr. De Novellis nor Mr. Kelley is currently pursuing through the administrative process EEO claims made prior to the recent reassignments. While Mr. De Novellis, like Ms. Janey–Burrell, has an earlier EEO claim which has been ruled upon by

Judge Saris (and is currently on appeal), it centers on an individual who was not implicated in this ACF reorganization in any way. With respect to De Novellis and Kelley, I adopt the findings and conclusions of Judge Saris in her September 30, 1996 *Order* denying their motion for a preliminary injunction.

**SO ORDERED.**