**BIOGEN IDEC MA INC.,**
**et al., Plaintiffs,**

v.

**The TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, Defendant.**

No. 03–11329–MLW.

United States District Court, D. Massachusetts.

Aug. 13, 2004.

288

Carla Miriam Levy, Foley Hoag LLP, Claire Laporte, Foley Hoag LLP, Donald R. Ware, Foley Hoag LLP, Katherine M. Hamill, Foley Hoag LLP, Boston, MA, Marcus E. Semel, Kirkland & Ellis, LLP, Mark A. Pals, Kirkland & Ellis, Chicago, IL, Michael S. D'Orsi, Donnelly, Conroy & Gelhaar, LLP, Peter E. Gelhaar, Donnelly, Conroy & Gelhaar, LLP, Boston, MA, for Biogen, Inc., Genzyme Corporation, Abbott Bioresearch Center, Plaintiffs.

David I. Gindler, Irell & Manella LLP, Jason Sheasby, Irell & Manella LLP, Morgan Chu, Irell & Manella, LLP, Los Angeles, CA, Scott McConchie, Griesinger, Tighe & Maffei, LLP, Thomas F. Maffei, Griesinger, Tighe & Maffei, LLP, Boston, MA, for The Trustees of Columbia University in the City of New York, Defendant.

### MEMORANDUM AND ORDER

WOLF, District Judge.

## I. INTRODUCTION

The plaintiffs in this case are drug companies. In 1993, plaintiff Biogen Idec MA Inc. ("Biogen") licensed from the Trustees of Columbia University in the City of New York ("Columbia") all patents deriving from an application that Columbia filed in 1980 (the "Axel Patents"). In 1994, plaintiff Genzyme Corporation ("Genzyme") obtained a similar license.

Biogen believed that all but one of the patents covered by its license expired in 2000, and that its obligation to pay royalties ended in the fall of 2002 when the last of the products manufactured before the expiration date of the patents Biogen was using were sold. However, after making what it represented to be the last payment due, Biogen was informed by Columbia that a new patent deriving from the 1980 application, U.S. Patent No. 6,455,275 (the " '275 patent"), had been issued on Sep-

tember 24, 2002. Columbia asserted that Biogen was, therefore, obligated to pay royalties for another seventeen years. A similar notice was sent to Genzyme.

Biogen, Genzyme, and the other plaintiff, Abbott Bioresearch Center, Inc. ("Abbott"), contend that the '275 patent is invalid because of the doctrine of non-statutory double patenting and for other reasons. They also assert that, if valid, the '275 patent is unenforceable because of prosecution laches. Therefore, the plaintiffs ceased paying royalties to Columbia under their respective agreements.

On July 15, 2003, the plaintiffs filed this suit against Columbia seeking, among other things, declarations that the '275 patent is both invalid and unenforceable.[1] In March 2004 Columbia notified Biogen and Genzyme that Columbia was terminating their licenses as a result of their refusal to pay royalties on the '275 patent. On April 7, 2004, Biogen and Genzyme sought relief from this court by filing a Joint Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion for Preliminary Injunction"). Pursuant to the stand-still agreement which the parties reached on April 14, 2004 that is incorporated in an April 15, 2004 Order, the parties were given additional time to brief the merits of the Motion for Preliminary Injunction. Under the stand-still agreement, if the court finds the Motion for Preliminary Injunction meritorious, it would enjoin Columbia's termination of Biogen and Genzyme's license agreements as of April 7, 2004. If the court denies the Motion for Preliminary Injunction, the license agreements would be deemed terminated as of April 2004 for Biogen and as of May 2004 for Genzyme in accordance with the provi-

sions of their respective agreements governing termination.

On June 22, 2004, the court heard oral argument on the Motion for Preliminary Injunction. For the reasons explained in this Memorandum, that motion is being denied.

In summary, the court finds that plaintiffs have, on the present record, made a strong showing that they are likely to prevail in proving that the '275 is invalid pursuant to the doctrine of non-statutory double patenting and, if valid, is unenforceable because of the equitable doctrine of prosecution laches. This strong showing of likely success on the merits reduces, but does not eliminate, the showing of irreparable harm that plaintiffs must make to obtain preliminary injunctive relief. Plaintiffs have failed to prove that they will suffer any irreparable harm if Columbia is not preliminarily enjoined from terminating their licenses. Therefore, the court is denying the Motion for Preliminary Injunction. The conclusion that the request for equitable relief should be denied is reinforced by the facts that the balance of hardships favors Columbia and the public interest will be served rather than injured by permitting the licenses to be terminated.

## II. FACTS AND PROCEDURAL HISTORY

The following facts are either undisputed or proven for present purposes.

### A. *Technology*

In the 1970s, the National Institutes of Health ("NIH") provided funding for, among other things, research conducted by

---

1. On April 8, 2004, the Judicial Panel on Multidistrict Litigation transferred all cases relating to the '275 patent to this court for coordinated or consolidated pretrial proceed-

ings. These cases are referred to collectively as the "Columbia Multidistrict Litigation." The instant case was filed in this district and is before this court for all purposes.

Drs. Richard Axel, Michael Wigler, and Saul Silverstein at Columbia relating to co-transformation of cells. This court described this technology as it applies to Biogen's processes and products in *Biogen, Inc. v. Berlex Laboratories, Inc.,* 113 F.Supp.2d 77 (D.Mass.2000), *aff'd in part, vacated in part and remanded,* 318 F.3d 1132 (Fed.Cir.2003).

Using recombinant DNA technology, proteins such as interferon can be produced in "host" cells which normally do not produce those proteins. Foreign DNA encoding the interferon protein is introduced into the host cell on a "DNA construct," which is also sometimes referred to as a "plasmid" or "vector." A DNA construct is an engineered piece of DNA that serves as a vehicle to facilitate transfer of a gene into the host cell. Once introduced into a eukaryotic cell, the DNA construct may integrate into the chromosome of the host cell. If stably integrated, the "gene of interest," in this case the interferon gene, can be "transcribed" into "RNA." That RNA may be "translated" into protein by the host cell. If the process is successful, progeny of the host cell will also have the gene of interest and produce the protein.

The process of introducing a foreign gene into a cell is known as "transfection." The term "transform" is often used interchangeably with "transfect," although "transform" implies that the foreign DNA has been successfully incorporated in the host cell. In this Memorandum the terms "transform" and "transformation" refer to the successful introduction of foreign genes into the chromosome of a host cell.

Multiple genes can be introduced into a host cell simultaneously, in a process called "co-transformation." Co-transformation is valuable because successful transformation is a rare event. Typically less than one cell in 100,000 successfully integrates a foreign gene. Thus, identification of CHO [Chinese Hamster Ovary] cells transformed with the interferon gene is both difficult and important.

To facilitate detection of transformed cells, scientists can introduce a "selectable marker gene," as well as the gene of interest, into a host cell. A selectable marker gene encodes a protein required by the cell to survive in certain growth conditions. Cells lacking this marker gene are used as hosts. After transformation has been attempted, scientists place the cells in medium which is nutritionally deficient or toxic to cells which did not integrate the marker gene and, therefore, do not produce the protein it encodes. A cell which has been transformed to include the selectable marker gene will survive in this medium because the transformed cell will compensate for the nutritional deficiency or toxicity. A cell which has not been transformed will die. In essence, the cells which have been transformed to contain the selectable marker gene will live and be identifiable as transformed.

When co-transformation is attempted, if the selectable marker gene has been successfully introduced, the interferon gene may have been successfully introduced as well. Thus, the marker gene facilitates the identification of cells that have been transformed to include interferon.

Co-transformation can be attempted by placing two genes on a single DNA construct and introducing it into the cell. This is called "linked co-transformation," or co-transformation with a "single construct". Alternatively, co-transformation can be attempted by placing two genes on different DNA constructs, and simultaneously introducing them into

the cell. This is referred to as "unlinked co-transformation" or co-transformation employing "multiple constructs" . . . . .

After either linked or unlinked co-transformation is accomplished, the host cell is grown in a "culture medium" in order to allow the gene of interest, in this case interferon, to be expressed as a protein. A "culture medium" is a solution that contains the nutrients required for maintenance and growth of the cell.

*Biogen,* 113 F.Supp.2d at 82–83 (footnotes and citations omitted).

Biogen uses this technology to produce "AVONEX (Interferon beta-la), the world's leading treatment for relapsing forms of multiple sclerosis." Bucknum Decl. ¶ 2. "More than 120,000 multiple sclerosis patients are currently being treated with AVONEX." *Id.* ¶ 3.

Genzyme has used this technology to "develop[ ] and commercialize[ ] CEREZYME (imiglucerase), the only available enzyme replacement treatment for Type 1 Gaucher disease, FABRAZYME (agalsidase beta) for the treatment of Fabry disease, and ALDURAZYME (laronidase) for treatment of MPS I (Mucopolysaccharidosis type–1)." Dupré Decl. ¶ 2.

## B. *The Patent Applications*

On February 25, 1980, Drs. Richard Axel, Michael Wigler, and Saul Silverstein filed a patent application. This application, No. 06/124,513 (the " '513 application") resulted in the issuance of U.S. Patent No. 4,399,216 (the " '216 patent") on August 16, 1983. The '513 application is also the ancestor of several other patent applications that have resulted, to date, in the issuance of three additional patents including the '275 patent.

The research that resulted in the '216 patent was funded by the NIH. On April 4, 1980, Columbia requested title to the invention under the then-governing regulations from the Department of Health and Human Services ("HHS"). Columbia further requested the right to grant an exclusive license to the patented invention. The NIH granted title to Columbia, but refused to give Columbia the unrestricted right to grant an exclusive license as Columbia had requested. *See* Letter from Charles Miller, Assistant Sec'y for Health, HHS to Paul A. Marks, Vice President for Health Services, Columbia University 1 (February 24, 1981) (Levy Decl., Tab 28) (the "NIH Determination Letter"). Moreover, the time in which Columbia could grant anyone an exclusive license appears to have now expired. *Id.* at 5. Columbia is generally obligated to "use all reasonable effort to bring the [Axel Patents] to the commercial market through licensing on a non-exclusive, royalty-free or reasonable royalty basis." *Id.* at 4. NIH also required that "[a]ny license granted by [Columbia] . . . shall include adequate safeguards against unreasonable royalties and repressive practices." *Id.* at 5.

"A later application for an independent or distinct invention, carved out of a pending application and disclosing and claiming only subject matter disclosed in the earlier or parent application, is known as a divisional application or 'division.' " Manual of Patent Examining Procedure ("MPEP") § 201.06. On August 11, 1983, five days before the '216 patent issued, Columbia filed a divisional application, No. 06/552,-408 (the " '408 application") based on the disclosure in the '513 application. Based on this application, on January 6, 1987, the PTO issued U.S. Patent No. 4,634,665 (the " '665 patent"). Evidently because the subject matter of the '665 patent's claims was obvious in view of the '216 patent's claims, the Patent Office permitted the '665 patent to issue only after Columbia filed a "terminal disclaimer," giving up

the part of the '665 patent's term that would have extended past the expiration date of the '216 patent, August 16, 2000.

On October 3, 1986, Columbia filed another divisional application, No. 06/915,273, this time based on the '408 application. Columbia abandoned this application, but not before filing a continuation application on May 2, 1989, No. 07/346,089 (the "'089 application"). "A continuation is a second application for the same invention claimed in a prior nonprovisional application and filed before the original prior application becomes abandoned or patented." MPEP § 201.07.

Columbia abandoned the '089 application as well, after filing another divisional application, No. 07/716,915. This application resulted in the issuance, on January 12, 1993, of U.S. Patent No. 5,179,017 (the "'017 patent"). Once again, however, the Patent Office allowed the claims only after Columbia filed a terminal disclaimer limiting the term of the '017 patent to the term of the original '216 patent.

Several months before the '017 patent issued, on June 26, 1992, Columbia filed a continuation application. Columbia abandoned this application after filing another continuation application on March 23, 1994. This application was also abandoned, but not until Columbia had filed another continuation application on February 27, 1995. This application, too, was eventually abandoned.

On June 7, 1995, Columbia filed two more continuation applications, Nos. 08/484,136 (the "'136 application") and 08/477,159 (the "'159 application"). The June 7, 1995 filing date for the '136 and '159 applications is very significant. On December 8, 1994, Public Law No.

103–465, the Uruguay Round Agreements Act, was enacted. Among other things, this legislation provided that all patents that issue based on applications filed on or after June 8, 1995—6 months after the Act was signed into law—would expire twenty years from the date the application was filed.[2] *See* 35 U.S.C. § 154(a)(2). The old rule was that patents expired seventeen years from the date of issuance. *See* 35 U.S.C. § 154 (1988). In order to grandfather in pending applications, the new law provided that all patents that issue based on applications filed before June 8, 1995 will last until either twenty years from the date the application was filed *or* seventeen years from the date the patent issues, whichever is later. *See* 35 U.S.C. § 154(c)(1)(A).

The '159 application is still pending, now more than nine years after being filed. However, by virtue of the application being filed on June 7, 1995, if the '159 application results in a patent (a "'159 patent"), it will be effective for seventeen years. If the '159 application had been filed a day later, a '159 patent would either not now issue or would immediately be deemed expired because the twenty-year period after the 1980 filing of the original application from which it derives ended in 2000.

The '136 application ultimately matured into the '275 patent involved in this litigation. It was issued on September 24, 2000. Had the '136 application been filed one day later, the '275 patent too either would not have issued or would have been immediately deemed expired on February 25, 2000 because its application date relates back to its great-great-great-great-great-great-grandparent application, the 1980 '513 application. However, since the '136 application was, by one day, eligi-

---

**2.** There are ways to extend a patent term beyond twenty years—for example, based on long delays during prosecution—but they are not at issue in this case. *See generally* 35 U.S.C. § 154.

ble for the seventeen years from issuance term, it will not expire until September 24, 2019—seventeen years after the date on which it was issued.

Columbia owns another patent that is relevant to the Motion for Preliminary Injunction, U.S. Patent No. 5,149,636 (the " '636 patent"). This patent issued on September 22, 1992 and expires on September 22, 2009. The '636 patent covers an invention in the same general field as the '216,- '665, '017 and '275 Axel patents. However, it resulted from a distinct application, filed in 1987, that was a continuation of a continuation of a continuation of an application filed on March 15, 1982. The other applications related to the '636 patent were all abandoned.

Neither Biogen nor Genzyme practices the '636 patent. Nor has either plaintiff expressed an intention or desire to practice it.

## C. *The License Agreements*

Columbia has entered into license agreements with all of the plaintiffs in the Columbia Multidistrict Litigation. Biogen entered into a license agreement in 1993 and Genzyme did so in 1994. The Biogen and Genzyme agreements have similar terms. The only material difference for present purposes is that Columbia may terminate Biogen's license agreement "upon 30 days' written notice to [Biogen] for [Biogen]'s material breach of" the agreement while Genzyme is subject to a sixty day termination period.[3] It is undisputed that failure to pay royalties that are due constitutes a material breach under the license agreements.

The license agreements provide for a payment of $30,000 each year which is credited toward any royalty payments that are due during that year. Royalties are owed for all sales of "Licensed Products". " 'Licensed Products' means products … the manufacture, use or sale of which is covered by a claim of Licensed Patent Rights which have neither expired nor been held invalid by a court of competent jurisdiction from which no appeal has or may be taken." License Agreement § 1(d)(i). "Licensed Patent Rights" includes the '216, '665, '017, and '275 patents as well as the '636 patent.

It also includes any new patents that issue based on applications that relate to these patents. As described earlier, the '159 application, which relates to the original '513 application that resulted in the '216 patent, is still pending before the PTO. Once again, if the '159 application results in a patent being issued, that patent would not expire until seventeen years from its issue date, because the '159 application was filed before June 8, 1995.

Under the license agreements, royalties are due based on sales of products manufactured during the period that the products or manufacturing process were covered by a valid patent. Therefore, even after the '216, '665 and '017 patents expired on August 16, 2000, the plaintiffs continued to make payments to Columbia as they depleted their inventories of drugs manufactured before the patents expired. Once those inventories were sold, the drug companies stopped paying royalties. For example, on September 26, 2002 Biogen sent Columbia a letter confirming a wire transfer and noting that as "Biogen has now depleted all inventories created prior to the U.S. patent expiration date, [t]his payment represents Biogen's final obli-

---

**3.** Although Genzyme's agreement also provides for a 30 day termination period, "Columbia granted Genzyme 60 days to cure [its material breach] pursuant to section 5(b)(i) of the" agreement. Gindler Decl. ¶ 4.

gation to Columbia under the . . . license agreement." Bucknum Decl. Tab 3.

Shortly after receiving this letter, Columbia notified Biogen that the '275 patent had issued on September 24, 2002 and, therefore, "Columbia does not agree that Biogen's payment for the second quarter of 2002 is its last royalty owed." *Id.* Tab 4; Dupré Decl. Tab 7. Similar notices were sent to Genzyme and Abbott.

After reviewing the '275 patent, Biogen and Genzyme each formed a belief that it was invalid. Therefore, while they continued to make the $30,000 annual maintenance payments, they stopped making royalty payments.

### D. *The Lawsuit*

On July 15, 2003, the plaintiffs filed a declaratory judgment action against Columbia seeking declarations that the '275 patent is invalid and unenforceable.

Columbia had not then terminated its license agreements with Biogen and Genzyme for failure to pay royalties. However, on March 9, 2004 Columbia sent letters to Biogen and Genzyme which would terminate their licenses in thirty and sixty days respectively. On April 7, 2004, just before Biogen's thirty-day period expired, Biogen and Genzyme filed the Motion for Preliminary Injunction, seeking an order restraining Columbia from terminating their license agreements pending the outcome of this case.

The parties subsequently reached a stand-still agreement, which was incorporated into an April 15, 2004 Order. The stand-still agreement and Order provide that: (1) if the court denies the Motion for Preliminary Injunction, then Columbia's termination of Biogen and Genzyme's license agreements will be effective as of the expiration of the applicable termination periods; (2) if the court allows the Motion for Preliminary Injunction, then Columbia's attempted termination of Biogen and Genzyme's license agreements will be enjoined as of April 7, 2004 and no termination will have taken place; (3) until the court decides the Motion for Preliminary Injunction, Columbia will not (a) seek leave to amend its answer to assert infringement counterclaims against Biogen or Genzyme, (b) initiate actions against Biogen or Genzyme asserting infringement of the '275 patent, or (c) seek injunctive relief against Biogen or Genzyme to enjoin any alleged practice of the invention claimed in the '275 patent. *See* April 15, 2004 Order.

Columbia filed a memorandum in opposition to the Motion for Preliminary Injunction. Biogen and Genzyme filed a reply.

The court ordered the parties to "file supplemental memoranda addressing the propriety of an injunction that prohibits Columbia from terminating Biogen and Genzyme's license agreements with respect to all rights other than the '275 patent pending the outcome of this case, but permits Columbia to terminate the license agreements with respect to the '275 patent." June 11, 2004 Order ¶ 6. The parties each filed a supplemental memorandum. No party questions the court's authority to enter a more narrowly tailored injunction than the one Biogen and Genzyme requested, which would prevent the termination of their licenses with regard to all of the relevant patents. *See* June 22, 2004 Tr. at 24. However, no party advocates a limited injunction, which would prevent the termination of the licenses with regard to some but not all of those patents. Instead, Biogen, Genzyme, and Columbia each urge the court to adopt the positions set forth in their original filings.

On June 22, 2004, the court held a hearing on the Motion for Preliminary Injunction and other motions then pending in the Columbia Multidistrict Litigation. At that hearing Columbia represented that it would not seek a preliminary injunction in this case. *See* June 22, 2004 Tr. at 81–82, 112. Therefore, there is no threat that Biogen and Genzyme will be restrained from manufacturing or distributing their respective drugs during the pendency of this case.[4]

At the June 22, 2004 hearing the court also implicitly denied Columbia's motion to stay completely the Columbia Multidistrict Litigation, including this case, pending the reexamination of the '275 patent by the PTO that was prompted by a February 27, 2004 request for *ex parte* examination made by the Public Patent Foundation. Rather, the court identified the contention that the '275 patent is invalid under the doctrine of non-statutory double patenting as one that should be able to be quickly developed and decided in 2004, either on a motion for summary judgment or at a trial to be conducted in December 2004. Thus, the court established a schedule for doing so and otherwise substantially stayed this case. *See* June 23, 2004 Order. Therefore, if plaintiffs are correct in their contention, the '275 patent should be declared invalid because of non-statutory double-patenting before 2005.

## III. ANALYSIS

### A. *The Applicable Standards*

■ "[T]he general considerations underlying the grant or denial of a preliminary injunction do not vary significantly among the circuits ...." *Mikohn Gaming Corp. v. Acres Gaming Inc.*, 165 F.3d 891, 894 (Fed.Cir.1998). Generally, the law of the circuit in which a case is brought governs. *Id.* However, a court should "give dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues." *Id.*

■ For the purposes of this case, there is no material difference between the standards for obtaining a preliminary injunction in the First and Federal Circuits. "In the typical case, a party seeking preliminary injunctive relief must prove: (1) a substantial likelihood of success on the merits; (2) a significant risk of irreparable harm if the injunction is withheld; (3) a favorable balance of hardships; and (4) a fit (or, at least, a lack of friction) between the injunction and the public interest." *Equal Employment Opportunity Comm'n v. Astra USA, Inc.*, 94 F.3d 738, 742 (1st Cir.1996); *accord Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed.Cir.2001) ("Amazon is entitled to a preliminary injunction if it can succeed in showing" essentially the same four elements). "[A] movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.* likelihood of success on the merits and irreparable harm." *Amazon.com*, 239 F.3d at 1350.

■ "[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." *Astra*, 94 F.3d at 743–44; *see also Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir.1996); *Gately v. Massachusetts*, 2 F.3d 1221, 1232 (1st Cir.1993) (irreparable harm is subject

---

**4.** Columbia also argued that if it prevails in this case it would be in its interest to grant licenses to Biogen and Genzyme rather than to restrain the production and distribution of their drugs. June 22, 2004 Tr. at 83. Indeed, the terms on which NIH granted Columbia the Axel patents may require that Columbia offer to license them to Biogen and Genzyme on reasonable terms.

to a "sliding scale" analysis); *Amazon.com*, 239 F.3d at 1350 ("[T]he district court must weigh and measure each factor against the other factors."). Nevertheless, no matter how strong the likelihood of success, some irreparable harm in the absence of an injunction must be proven. *Astra*, 94 F.3d at 743; *Gately*, 2 F.3d at 1232; *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir.2004).

■ Therefore, " '[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' " *Astra*, 94 F.3d at 743 (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). "Irreparable harm" is proven if, absent an injunction, the plaintiff will "suffer[ ] a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross–Simons*, 102 F.3d at 19.

■ "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank*, 370 F.3d at 162. "[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." *Ross–Simons*, 102 F.3d at 19; *see also Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–7 (1st Cir.1991); *Pub. Svc. Co. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir.1987); *Regan v. Vinick & Young (In re Rare Coin Galleries of Am.)*, 862 F.2d 896, 902 (1st Cir.1988). Rather, the threat of irreparable harm must be real and "immediate." *Fundicao Tupy S.A. v. United States*, 841 F.2d 1101, 1102–03 (Fed.Cir.1988); *Auto. Radio Mfg. Co. v. Ford Motor Co.*, 390 F.2d 113, 116 (1st Cir.1968).

B. *The Likelihood of Success on the Merits*

The plaintiffs have made a strong showing that they are likely to prove that the '275 patent is invalid under the doctrine of non-statutory double patenting and, if valid, is unenforceable because of prosecution laches.

■ An issued patent is presumed valid and can only be proven invalid by clear and convincing evidence. *See* 35 U.S.C. § 282.

[35 U.S.C. § 101] precludes more than one patent on the same invention..... Section 101, however, only prohibits a second patent on subject matter identical to an earlier patent. Thus, applicants can evade this statutory requirement by drafting claims that vary slightly from the earlier patent.

[Therefore, courts have] fashioned a doctrine of nonstatutory double patenting (also known as "obviousness-type" double patenting) to prevent issuance of a patent on claims that are nearly identical to claims in an earlier patent. This doctrine prevents an applicant from extending patent protection for an invention beyond the statutory term by claiming a slight variant.

*Geneva Pharms., Inc. v. Glaxosmithkline Plc*, 349 F.3d 1373, 1377–78 (Fed.Cir.2003) (citations and footnote omitted). "Under obviousness-type double patenting, a patent is invalid when it is merely an obvious variation of an invention disclosed and claimed in an earlier patent by the same inventor." *Ga.-Pac. Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1326 (Fed.Cir. 1999), *amended by*, 204 F.3d 1359 (Fed. Cir.2000).

The plaintiffs have presented the declaration of Harvey F. Lodish on the issue of non-statutory double patenting. Dr. Lodish is a professor at the Massachusetts

Institute of Technology, and the lead author of an important, relevant textbook, *Molecular Cell Biology.* In his eighteen-page affidavit, Dr. Lodish employs the legally correct criteria for proving non-statutory double patenting, and explains and illustrates in detail why the three independent claims of the '275 patent that he analyzes "are not patentably distinct over claims of the '017 patent and are invalid for obviousness type double patenting." Lodish Decl. ¶ 34.[5]

Columbia has not presented any evidence, or even argument, to refute Dr. Lodish's analysis. Rather, Columbia relies on the presumption that the '275 patent is valid. Columbia also contends that even if Dr. Lodish's analysis of the claims he addresses is correct, there may be other independent or dependent claims that are valid. However, Columbia has not identified the limitations in even one claim not addressed by Dr. Lodish that would arguably make it patentably distinct from the claims in the earlier Axel patents. Nor has Columbia explained why the three claims carefully analyzed by Dr. Lodish are not representative of all of the claims of the '275 patent.

The presumption of validity and the requirement that the invalidity of each claim be proven by clear and convincing evidence will ultimately place a heavy burden of proof on plaintiffs. *See Symbol Techs., Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1580 (Fed.Cir.1991). Nevertheless, the undisputed and, at this point compelling, analysis done by Dr. Lodish establishes that plaintiffs are likely to satisfy that burden and prevail in proving that the '275 patent is invalid.

] Plaintiffs have also shown that if the '275 patent is valid, they are likely to prove that it is unenforceable under the equitable doctrine of prosecution laches. Prosecution laches can render a valid patent unenforceable. "In *Symbol Technologies, Inc. v. Lemelson Medical,* 277 F.3d 1361, 1368, 61 U.S.P.Q.2d 1515, 1520 (Fed. Cir.2002), in the context of an infringement case, [the Federal Circuit] recently held that the equitable doctrine of laches may be applied to bar enforcement of a patent that issued after unreasonable and unexplained delay in prosecution, even though the patent applicant complied with pertinent statutes and rules." *In re Bogese,* 303 F.3d 1362, 1367 (Fed.Cir.2002); *see also Reiffin v. Microsoft Corp.,* 270 F.Supp.2d 1132, 1149–1152 (N.D.Cal.2003). In *Symbol,* the court analyzed and relied upon much earlier Supreme Court cases in which an unexplained nine-year delay and an unreasonable eight-year delay rendered the patents and claims at issue unenforceable. *See Symbol,* 277 F.3d at 1364 (discussing the "unexplained nine-year delay" in *Woodbridge v. United States,* 263 U.S. 50, 44 S.Ct. 45, 68 L.Ed. 159 (1923) and the "unreasonable eight-year delay" in *Webster Electric Co. v. Splitdorf Electric Co.,* 264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792 (1924)).

The *Woodbridge* Court identified two substantive policies served by the doctrine of prosecution laches: (1) preventing a patent applicant from deliberately delaying the issuance of a patent the applicant "always intended to secure" solely to increase the commercial value of the patent; and (2) preventing a patent applicant from unreasonably post-

---

**5.** The court is not now adopting for all purposes the claim construction on which Dr. Lodish relies. At this point, it is not disputed. If it is later disputed, the court will resolve that dispute. It is uncertain whether extrinsic evidence such as Dr. Lodish's opinions on the issue of claim construction will be permissible or appropriate to assist the court in its claim construction. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576 (Fed.Cir.1996).

poning "the time when the public could enjoy the free use of [an] invention" that would otherwise have been made available to the public at a much earlier date. *Reiffin,* 270 F.Supp.2d at 1150.

In the instant case, the '275 patent was issued twenty-two years after the application from which it derives was filed. There were several delays in the prosecution of the application. Columbia has provided no evidence, or even argument, to explain why it took twenty-two years to obtain the '275 patent or to justify the delays in that process.[6] The timing of its issuance strongly suggests that Columbia deliberately delayed obtaining a patent that it always intended to secure in order to make it effective just as the other Axel patents expired and thus increase its commercial value by maximizing the period in which the public would have to pay Columbia royalties for the use of the Axel patents.

Accordingly, plaintiffs have made a strong showing that they are likely to prevail on the claim that, if valid, the '275 patent is unenforceable because of prosecution laches.

### C. *Irreparable Harm*

As described earlier, plaintiffs' strong showing that they are likely to succeed on the merits reduces, but does not eliminate, the showing of irreparable harm that they must make to obtain a preliminary injunction. Plaintiffs allege that they will suffer several forms of irreparable harm if Columbia is allowed to terminate their licensing agreements. However, plaintiffs have either failed to prove that a particular

alleged harm will occur or to prove that it will be irreparable.

Plaintiffs contend that if their licenses are terminated Columbia will move to enjoin them from using its patents during the pendency of this case and that such an injunction would cause them immeasurable money damages and loss of market share, as well as injure the health of customers who depend on plaintiffs' drugs. However, at the June 22, 2004 hearing Columbia represented that it would not seek a preliminary injunction in this case. *See* June 22, 2004 Tr. at 81–82, 112. The court is relying on this representation and Columbia will be bound by it. *See Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 32–33 (1st Cir.2004).

Plaintiffs also argue that if their license agreements are terminated because they are challenging the '275 patent they will lose the right to practice the '636 patent. This may be true. However, plaintiffs have never practiced the '636 patent. Nor have they expressed any desire or intention to do so. Therefore, any loss of the right to practice the '636 patent will not, as a practical matter, harm them at all.

Plaintiffs also assert that termination of their licenses will deprive them of the opportunity to practice any patent that is issued in the future as a result of the pending '159 application. As explained at the June 22, 2004 hearing, this contention has concerned the court. In essence, termination of the licenses may cause plaintiffs to lose the right to use *on advantageous financial terms* a potential patent whose value, validity, and enforceability they cannot now fully assess because the application is being prosecut-

---

6. "Analyzing the 2,224,379 patents that issued from 1976 through 2000, two commentators found that prosecution of these patents 'took an average of 2.47 years from the earliest claimed filing date to issuance date.'" Pls.' Mem. in Supp. of Mot. for Prelim. Injunction at 29 n. 8 (quoting Mark A. Lemley & Kimberly A. Moore, "Ending Abuse of Patent Continuations," 84 *B.U. L.Rev.* 63, 71 (2004)).

ed in an *ex parte* PTO proceeding.[7] In some circumstances, a "tying" arrangement that requires plaintiffs to pay royalties on a patent they believe is invalid in order to preserve the option to practice another patent may be something that a court of equity should not permit. *Cf. Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859, 864 (Fed.Cir.1987) (*"Cordis II"*). Thus, the court has considered issuing a limited preliminary injunction that would prevent termination of plaintiffs' rights to utilize any patent that is issued based on the '159 application. However, the prospects of such a patent issuing and of plaintiffs wanting to license rather than challenge it are too speculative to justify even such a narrow restraint.

■■■ As described earlier, the required finding of irreparable harm cannot be based on tenuous speculation or unsubstantiated fears. *See Charlesbank*, 370 F.3d at 162; *Ross–Simons*, 102 F.3d at 19; *Narragansett Indian Tribe*, 934 F.2d at 6; *Pub. Service Co.*, 835 F.2d at 383; *In re Rare Coin*, 862 F.2d at 902. Biogen and Genzyme have stated that:

> While plaintiffs believe that any claims issuing from [the '159] application could not be valid or enforceable, given the dilatory way in which Columbia has pursued them, plaintiffs cannot anticipate whether any claims might still issue, what those claims might be, whether Columbia might have any arguable basis for asserting that those claims were valid, and whether those claims would cov-

er plaintiffs' products. (Plaintiffs are aware that Columbia has, during prosecution of the '159, sought claims specifically directed to beta interferon products.)

Pls.' Mem. in Supp. of Mot. for Prelim. Injunction at 39. In essence, plaintiffs describe the harm to them from a potential '159 patent as highly speculative.

In any event, the court finds that such possible harm is now merely a matter of conjecture. The '159 application has been pending for nine years. It is uncertain whether it will ever result in the issuance of a patent. As required by 35 U.S.C. § 290, the PTO has been informed of this litigation by the Clerk of this court. Upon request of a private party not involved in the Columbia Multidistrict Litigation, the PTO has agreed to reexamine the '275 patent. This reexamination indicates that the PTO has determined that there is a substantial new question of patentability—the issue of non-statutory double patenting. *See* Order Granting Request for Ex Parte Reexamination, No. 90/006,953 (PTO May 10, 2004). Plaintiffs contend that the reasons that they believe render the '275 patent invalid for non-statutory double patenting are likely to be equally applicable to the '159 application.[8] If this is true, the PTO should reject the application and no '159 patent should issue.

In any event, the court has established a schedule for resolving within five months the merits of plaintiffs' non-statutory dou-

---

**7.** Although the on-going prosecution of the '159 application is by statute confidential, *see* 35 U.S.C. § 122, the PTO has on multiple occasions, and at least as recently as May 2004, released copies of the prosecution history to third parties, including the plaintiffs. *See* Letter from Robert J. Spar, Director, Office of Patent Legal Administration to John P. White (July 19, 2004) (Columbia's Resp. to Pls.' Supp. Mem. (Docket No. 77) Ex. A); Pl.'s Reply Mem. in Supp. of Mot. for Prelim.

Injunction Tab 3. Accordingly, the plaintiffs have some information regarding the prosecution of the '159 application.

**8.** As described in footnote 7, *supra*, plaintiffs had received the then existing prosecution history of the '159 application before forming their belief that any patent that might emerge from that application would be invalid.

ble patenting challenge to the '275 patent on a motion for summary judgment or at trial. *See* June 23, 2004 Order. In *Public Service Company of New Hampshire*, the First Circuit found that "the lack of any indication that the merits of this case would not be decided before the critical time for the [administrative agency's] decision ..." contributed to the conclusion that "the prospects of any irreparable damage were speculative." *See* 835 F.2d at 382–85. This is also true in the instant case.

Moreover, plaintiffs have clearly indicated that they are likely to challenge the validity and enforceability of any '159 patent that issues, rather than pay royalties on it if the licensing agreements are not terminated. This too contributes to the conclusion that they are not likely to be unfairly prejudiced with regard to any '159 patent if their licenses are now terminated.

If a '159 patent is issued and plaintiffs do, unexpectedly, want to license it, Columbia will be obligated by its 1981 arrangement with NIH to grant Biogen and Genzyme licenses and not charge them an "unreasonable royalt[y]." *See* NIH Determination Letter 5, (Levy Decl., Tab 28). At the June 22, 2004 hearing, Columbia indicated that it would do so. *See* June 22,

2004 Tr. at 81–82. Therefore, plaintiffs have not shown that there is a realistic risk that a '159 patent that they would like to license will issue, but that they will be unable to license it on terms that are reasonable, although perhaps not identical to those in the licensing agreements being terminated.[9]

■ Plaintiffs also contend that the uncertainty and disruption that termination of their licenses would cause is irreparable because it cannot be easily measured or compensated. As support, they rely on the Federal Circuit's decision in *Cordis II*. However, this reliance is misplaced.

In *Cordis II*, the court stated that, "the trial court did not make legal error or abuse its discretion in concluding that termination of the license agreement would cause loss of market share and possible further litigation against Cordis and its customers for patent infringement, thereby irreparably injuring Cordis." 835 F.2d at 864. The instant case is distinguishable. There is no evidence, or relevant judicial finding,[10] that plaintiffs will lose market share if their licenses are terminated. They make drugs that treat debilitating diseases. There is no evidence or case

---

**9.** Moreover, in the unlikely event that the plaintiffs want to license and pay royalties for a new patent issuing from the '159 application (or for the '636 patent), any alleged damages will be measurable; they will be the difference between what plaintiffs would have paid under the terminated license agreements and what they actually pay under the new license agreements. Thus, the harm that they will have suffered will not be "irreparable" because it will not be "a substantial injury that is not completely measurable or adequately compensable by money damages." *Astra*, 94 F.3d at 743. In addition, a court might have the authority to reinstate the plaintiffs' license agreements if it is alleged and proven that they were terminated unlawfully. *Cf. Narragansett Indian Tribe*, 934 F.2d at 7 n. 3 (discussing possibility that, at end of

litigation, court could "order[ ] that the house be razed and the land restored"); *Pub. Svc. Co.*, 835 F.2d at 381 ("[I]f the Company were eventually to prevail, the permit could be reinstated and the poles reinstalled."). These questions are, however, not now before the court.

**10.** It appears that the district court in *Cordis II* relied at least in part on a finding regarding irreparable harm in the pacemaker industry made in another case. *See Cordis Corp. v. Medtronic, Inc.*, 2 U.S.P.Q.2d 1845, 1986 WL 15722, at *3 (D.Minn.1986) (citing *Medtronic, Inc. v. Catalyst Research Corp.*, 518 F.Supp. 946, 954 (D.Minn.), *aff'd*, 664 F.2d 660 (8th Cir.1981)); *Cordis II*, 835 F.2d at 864.

that indicates that doctors will alter their practice of prescribing those drugs if the licenses are terminated. Moreover, as described earlier, Columbia has represented that it will not seek preliminary injunctive relief against plaintiffs. There is no evidence suggesting that Columbia intends to sue any of plaintiffs' customers. Therefore, there is not in this case a factual basis for the findings that constituted the showing of irreparable harm in *Cordis II*.

Accordingly, plaintiffs have not satisfied the essential requirement of proving that they will suffer some irreparable harm if a preliminary injunction is not entered.

### D. The Balance of Hardships and the Public Interest

 In this case it is most appropriate to consider together the third and fourth factors of the preliminary injunction analysis—the balance of hardships and the public interest.

Biogen stopped making royalty payments to Columbia in 2002. Genzyme has also never made any royalty payments relating to the '275 patent. If Columbia is enjoined from terminating the licensing agreements, plaintiffs will make no royalty payments during the pendency of this case. In view of the March 5, 2004 decision of the Federal Circuit in *Gen–Probe Inc. v. Vysis, Inc.*, 359 F.3d 1376 (Fed.Cir. 2004), plaintiffs contend that if they did pay royalties they would lose their right to challenge the validity and the enforceability of the '275 patent because the constitutional requirement of an "actual controversy" would not be satisfied. This may be correct. In *Gen–Probe*, the Federal Circuit stated, in part, "that a licensee must, at a minimum, stop paying royalties (and thereby materially breach the agreement) before bringing suit to challenge the validity or scope of the licensed patent." *Id.* at 1381. However, the implications of *Gen–*

*Probe* for this case are essentially academic. Plaintiffs stopped paying royalties long before *Gen–Probe* was decided. They contend that they cannot be compelled to pay royalties. *See Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969); *Cordis Corp. v. Medtronic, Inc.,* 780 F.2d 991, 995 (Fed.Cir.1985) (*"Cordis I "*).

In any event, in *Cordis I*, 780 F.2d at 995, the Federal Circuit reversed a decision preliminarily enjoining the termination of a license agreement and ordering that royalty payments be held in escrow pending the outcome of the case. The reasoning of *Cordis I* is relevant to the instant case. Here, as in *Cordis I*, a preliminary injunction perpetuating the licensing agreements would deprive the patentee of royalties during the pendency of the case and limit the amount the licensees would owe if they ultimately lose to the contractual royalty rate. However, as the Federal Circuit stated in *Cordis I*, " '[i]t would not be fair for the plaintiffs to be allowed simultaneously to reap all the benefits of the licensing agreement and to deprive the licensor of all his royalties.' " *Id.* at 995 (quoting *Warner–Jenkinson Co. v. Allied Chem. Corp.,* 567 F.2d 184, 188 (2d Cir.1977)); *see also Gen–Probe,* 359 F.3d at 1382 ("Moreover, permitting Gen–Probe to pursue a lawsuit without materially breaching its license agreement yields undesirable results: .... the licensor would bear all the risk, while licensee would benefit from the license's effective cap on damages or royalties in the event its challenge to the patent's scope or validity fails.").

In reaching its conclusion in *Cordis I* the Federal Circuit recognized that in *Lear*, 395 U.S. at 670–71, 89 S.Ct. 1902, the Supreme Court emphasized "the important public interest in permitting full and free competition in the use of ideas which are in

reality a part of the public domain" that is served by permitting licensees to stop paying royalties while they challenge patents. *Cordis I,* 780 F.2d at 995. However, as the Federal Circuit explained:

> This public policy statement *does* permit a licensee to cease payments due under a contract while challenging the validity of a patent. It *does not* permit the licensees to avoid facing the consequences that such an action would bring.

*Id.*

In the instant case this means that plaintiffs need not (and in view of *Gen–Probe* arguably cannot) pay royalties while challenging the '275 patent, but that it is consistent with the public interest to allow Columbia to terminate their licenses. Plaintiffs will then run the risk that they may be required to pay more than the present royalty rate if they do not succeed in their challenges to the '275 patent. *See* 35 U.S.C. § 284 ("[T]he court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.").

Imposing this risk on plaintiffs is not an undue hardship. Nor, for the reasons described earlier, is the loss of their licenses to practice the '636 patent and any patent that may result from the '159 application.

As explained earlier, it has not been shown that the termination of the licenses will disrupt the production or distribution of plaintiffs' valuable drugs or injure doctors' willingness to prescribe them. Therefore, the public interest in promoting health will not be harmed by the terminations.

Accordingly, the balance of hardships favor Columbia and the public interest will be served rather than injured by denying plaintiffs' motion for preliminary injunction.

## IV. ORDER

Accordingly, the Joint Motion of Plaintiffs Biogen Idec MA Inc. and Genzyme Corporation for a Temporary Restraining Order and a Preliminary Injunction (Docket No. 36) is hereby DENIED.